In re James K. COOK and Brenda L. Cook, d/b/a Cook Ranch and Cook Irrigation, Debtors.

In re Joseph B. COOK and Jean M. Cook, d/b/a Cook Ranch and Cook Irrigation, Debtors.

In re COOK ANGUS RANCH, a partnership, a/k/a Cook Ranch, Cook Irrigation, Joseph A. Cook and James K. Cook, partners, Debtors.

UNION STATE BANK OF HAZEN, Plaintiff,

v.

James K. COOK and Brenda L. Cook, d/b/a Cook Ranch and Cook Irrigation, Joseph B. Cook and Jean M. Cook, d/b/a Cook Ranch and Cook Irrigation, Cook Angus Ranch, a partnership, a/k/a Cook Ranch, Cook Irrigation, Joseph B. Cook and James K. Cook, partners; Thomas Cook and United States of America/Farmers Home Administration, Defendants.

Bankruptcy Nos. 85–05076 to 85–05078. Adv. No. 86–7021.

United States Bankruptcy Court, D. North Dakota.

June 26, 1986.

David L. Johnson, Fargo, N.D., for plaintiff.

Max Rosenberg, Bismarck, N.D., for Cooks.

Charles S. Miller, Jr., Atty., Dept. of Justice, Bismarck, N.D., for U.S.

William P. Westphal, U.S. Trustee.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The plaintiff, Union State Bank of Hazen (Bank), by complaint filed February 18, 1986, seeks to establish a priority position ahead of various parties claiming interests in property of the debtor estates. The Bank alleges that its interest in certain cash collateral is superior to that of defendant Farmers Home Administration (FmHA). The Bank also alleges that it has an interest in rental income from the debtors' real estate for the 1986 season which is superior to any interest of the defendants. In addition, the Bank and Tom Cook (Tom), debtor Jim Cook's brother, are in dispute as to each party's respective interest in cattle in the debtor's present possession, in which Tom claims an ownership interest. By answer filed March 17, 1986, the debtors generally denied the Bank's allegations. By answer filed March 17, 1986, Tom agreed that a dispute exists regarding his interest in the cattle. By answer filed March 24, 1986, FmHA agreed that its interest in cash proceeds was disputed and counterclaimed against the Bank for compensation for the use and conversion of feedstuffs in which FmHA has a superior interest. The Bank responded by asserting that it has a superior position. Prior to trial, the Bank and FmHA resolved their differences. Thus, a trial on the disputes remaining between the Bank, Tom Cook, and the debtors was held before the undersigned on April 23, 1986. The facts, as material, are as follows:

### FINDINGS OF FACT

The defendants/debtors, James and Brenda Cook, Joseph and Jean Cook, and Cook Angus Ranch each filed a Chapter 11 bankruptcy petition on February 5, 1985, and have continued to operate under the protection of the United States Bankruptcy Code since that time.

Debtors Joseph and Jean Cook are the parents of the debtor James Cook and the non-debtor/defendant, Tom Cook. The debtors operate a family farm and ranching business which has also included the sale of

irrigation equipment. The production from the debtors' farming operation has mainly been used as feed for cattle, including those in their custom feedlot and their own herd of purebred Angus cattle. The debtors have in the past also conducted an annual production sale as a tool in merchandising the Angus breeding cattle which they produce.

The debtors relocated their farm and ranch operation from eastern North Dakota to near Hazen, in western North Dakota, in 1962. James Cook (Jim) has resided at the Hazen location since graduating from college in 1964 and has since been actively involved in operating the ranch. Unlike Jim, Tom Cook has not returned to the family farm and ranch, but Tom has maintained ties to it. Tom grew up in eastern North Dakota, before the ranch was relocated, and had Angus cattle as 4–H projects. Cancelled checks establish that Tom purchased cattle in earlier years. Many of the cattle in which Tom now claims an ownership interest are direct descendants of a registered Angus cow which was part of his 4–H project. Tom is currently employed by the National Cattleman's Association (NCA). During the past four and one-half years of his thirteen years with the NCA, Tom has worked out of the Washington, D.C. office, holding the position of Director of Industry Affairs.

It is not clear from the evidence exactly how many head of cattle, or the amount of proceeds thereof, Tom is claiming an interest in. The statement of financial affairs filed in the Cook Angus Ranch case listed the ranch as holding cattle for Tom valued at approximately $22,200.00 which included approximately 36 head. At trial, Tom presented the court with a list containing 21 cows, and various offspring thereof, which he claims to be the sole owner of. The cattle which Tom claims are his were either branded with the Cook Angus Ranch brand, or in the case of younger stock, were not yet branded. However, the cattle all contained a permanent ear tattoo of the animal's identification number, which corresponds to the number listed on the American Angus Association (AAA) registration certificates and which also corresponds to numbered ear tags which identify the animals. Although some of the offspring of the cows may not have been registered, all of the cattle which Tom claims an interest in are either the cows registered in his name or the offspring thereof.

The AAA registration certificates, many of which were introduced at trial, are used to maintain purity of bloodlines within the Angus breed. A registration certificate is issued for each animal registered with the AAA. The certificate contains the animal's registration number, name, sex, ear tattoo number, birthday, and a three generation chart or pedigree of the animal's ancestors. In addition, the certificate contains the individual breeder of the animal, the first owner, and the present owner, along with the present owner's member code and date of sale if the animal has been purchased from someone else. In the eyes of the AAA, the registration certificate is proof of ownership.

A computer print-out from the AAA was also introduced as evidence of Tom's interest in the cattle. The computer print-out contains a listing of twenty-one cows and five bulls which the AAA records indicate were owned by Tom as of July 3, 1985. Tom was listed as breeder and first owner of all but two of the animals on the list, the exception being a bred female purchased by Tom from Vermillion Ranch in Montana, which was documented by a cancelled check, and a calf born from that purchase.

Robert Albers, a lifelong resident of Hazen and also a farmer and feedlot operator, had served as a consultant to the debtors until February, 1986. He is presently employed by the Bank as a consultant to oversee the Cook operation. Albers was aware of Tom's ownership in the cattle prior to the time when he became employed by the ranch. He also knew Tom was listed in the annual production sale catalogs as a breeder of some of the cattle. The court is convinced that, at least between the debtors and Tom, the Cooks all

considered Tom as the owner of the contested cattle.

The business relationship between Tom and the debtors can be characterized as being quite loose. Tom has often allowed the income from sale of his cattle to be retained in the debtors' operation. Tom has not ever had a formal agreement with the debtors and does not consider himself to ever have been a legal partner in the debtors' business. He has, however, contributed some money directly to the operation for supplies, semen and registration certificates, and for purchase of a computer for the ranch to use. In addition to monetary contributions, Tom normally spends a week at the ranch in the spring to assist in working the cattle. He also spends some time at the ranch during the holidays at which time he does most of the registration and record keeping necessary to register the cattle with the AAA.

Tom's cattle have normally been fed as a group with the debtors' cattle and with feed produced on the ranch, in which the Bank has held a security interest. Jim has had virtually full authority to manage, cull, and market Tom's cattle as he sees fit, although Tom has never given Jim the authority to mortgage the cattle. Moreover, Jim testified that he did not have authority to encumber Tom's cattle. Tom has never shared in profits or losses of the ranch operation, nor has he ever made loans with any bank in connection with the Cook ranch operation. Neither has Tom ever filed a partnership return.

Tom's "F" schedules from his various tax returns, which are schedules of farm income and expenses, are useful in summarizing the nature of his income and expenditures relating to the cattle in which he claims an interest:

| Year | Cattle Income | Breeding Fees | Supplies, Travel, Subscriptions and Phone | Total Expenses |
|------|---------------|---------------|-------------------------------------------|----------------|
| 1983 | $1,666.00 | $ 37.00 | $1,421.00 | $1,460.00 |
| 1982 | $2,500.00 | $2,780.00 | $1,557.00 | $4,337.00 |
| 1980 | $1,600.00 | $ 329.49 | $ 789.09 | $1,118.49 |
| 1979 | $5,700.00 | $4,822.00 | $1,116.50 | $5,938.50 |
| 1978 | $ 300.00 | $ 203.00 | $ 387.00 | $ 490.00 |
| 1977 | $ 312.00 | $ 576.00 | $ 412.00 | $ 988.06 |
| 1976 | $ 750.00 | $ 955.00 | $ 409.00 | $1,364.00 |
| 1975 | $ 357.15 | $ 535.00 | $ 492.70 | $1,027.70 |

From the above information and testimony, it appears that Tom has allowed most, if not all, of his cattle income to remain in the operation and that he has directly received income only to the extent necessary to offset some of his direct cattle expenses.

The Bank's involvement in these proceedings centers around financing arrangements entered into between the Bank and the debtors in 1981, in conjunction with a guaranteed loan program with FmHA. On September 23, 1981, the debtors granted the Bank a security interest in, *inter alia:*

All livestock now owned or hereafter acquired including the increase thereof but not limited to the attached list together with the young and produce thereof....

The basis for the Bank's claim to all of the cattle which were located on the debtors' ranch is this security agreement which has been properly perfected. Subsequent to the bankruptcy filing, many of the cattle at the ranch have been sold pursuant to an agreement between the Bank and the defendants, with the proceeds of the disputed cattle being held pending this court's determination as to the parties' priority.

Dale Roemmich (Roemmich), assistant vice president at the Bank, and Harvey Huber, president of the Bank, have dealt

with the debtors since 1981, dealing principally with Jim Cook. Roemmich has met Tom Cook, but has never had any conversations with him at the Bank and was unaware, prior to the bankruptcy, that Tom claimed an interest in some of the cattle. Prior to February 1, 1986, Roemmich had made casual inspections of the Cook operation but focused his attention primarily on the feedlot and feedstuffs, and had never counted the cattle. Roemmich agrees it is possible that some other cattle besides the debtors, could have been on the ranch. Roemmich testified that all he had relied on in obtaining security from the debtors, were the financial statements, signed by Jim Cook, which represented the ranch as having 215 cows. Jim Cook testified that the cattle numbers on the debtors' financial statements never included Tom Cook's cattle. The financial statement which Tom Cook signed in June of 1984 lists assets of 215 cows, as did the financial statements signed by him on August 19, 1983, and April 17, 1983. An older non-dated financial statement lists the debtors as having 204 cows. However, an inventory sheet, prepared for FmHA by Jim Cook, signed on July 12, 1981 by Harvey Huber, the Bank's president, listed the debtors as having 180 cows. When the bankruptcy petition was filed in February of 1985, it listed 150 cows as assets of the debtors although the direct examination of Jim by the Bank's counsel gives the court the impression that both the Bank and the debtors believe the debtors owned 170 cows at the time of filing. When asked to explain the discrepancy between the 170 cows owned by the debtors at the time of filing and the 215 listed on the financial statement signed by Jim in June of 1984, Jim stated that an adjustment for 46 cows sold in February of 1984, the $25,273.74 proceeds thereof which the Bank received, was inadvertently not made. Roemmich had apparently prepared the August 29, 1983 financial statement and the June 12, 1984 financial statement, which Jim casually reviewed and signed. There is no indication that Jim intentionally misrepresented the number of cows owned by the ranch when he signed the June, 1984

financial statement, or that he intended to defraud the Bank in any way. To the contrary, the court notes that a previously filed nondischargeability action, based upon these exact same facts, was voluntarily dismissed with prejudice. Accordingly, the court believes, based upon the evidence before it, that Jim Cook did not include Tom's cattle in the 215 head of cows listed as assets on the various financial statements.

Harvey Huber, the Bank's president, has known Jim Cook socially since 1968. He has attended at least one of the debtors' Angus production sales, that being in 1981, and has looked through the production sale catalog. Although the production sale catalog contained reduced copies of the registration certificates of the animals to be sold in the sale, some of which listed Tom Cook as a breeder and owner, Huber testified that he did not know, prior to the bankruptcy, that Tom had any interest in any of the cattle. Nevertheless, Huber testified that his dealings with the Cooks have always been honest and aboveboard. Likewise, the testimony of both Tom and Jim Cook strikes the court as being straightforward and reliable. Although Huber signed the 1981 inventory sheet for the FmHA loan guaranty, he too, like Roemmich, had never made a count of the cow inventory on the ranch prior to the bankruptcy proceedings.

The other matter before the court is the validity of an interest the Bank claims in rents based upon an assignment of rents clause. On January 1, 1983, the debtors executed a mortgage which also contained an assignment of rents clause, along with a promissory note evidencing the indebtedness of $167,076.00. The debtor also executed a mortgage on January 25, 1984, on the same property, as security for a $121,600.66 note. The 1984 mortgage did not contain an assignment of rents clause. The note secured by the 1983 mortgage which contained the assignment of rents clause is in default. Northwestern Mutual Life Insurance (Northwestern), holder of a first mortgage on the real estate in question, served James K. Cook with a Notice of Intention to Foreclose prior to the bank-

ruptcy proceedings. Principal in the amount of $119,183.75 plus interest of $45,-237.40 for a total amount of $164,421.15 was due on the Bank's note as of the date of the trial. The June 1, 1983 mortgage, was recorded on June 6, 1983, at the Mercer County Register of Deeds Office. There is no evidence that the assignment of rents or the mortgage has been recorded at any other location.

### CONCLUSIONS OF LAW

#### 1.

The first issue which the court will address is the effect of the assignment of rents clause contained in the January 1, 1983 mortgage.

Northwestern Mutual Life Insurance (Northwestern), holder of a first mortgage on the real estate in question, served James K. Cook with a Notice of Intention to Foreclose, prior to the bankruptcy proceedings. The debtors contend that because a notice of intent to foreclose is a condition precedent to issuing a summons and complaint to foreclose, the Bank is prohibited from enforcing its assignment of rents.

■ State law controls when determining the validity and extent of a security interest in rental proceeds. *In re Fluge*, 57 B.R. 451, 454 (Bankr.D.N.D.1985). *See also Butner v. United States*, 440 U.S. 48, 56, 99 S.Ct. 914, 918–19, 59 L.Ed.2d 136 (1979); *Matter of Village Properties, Ltd.*, 723 F.2d 441, 443 (5th Cir.1984), *cert. denied*, 466 U.S. 974, 104 S.Ct. 2350, 80 L.Ed.2d 823 (1984). Section 28–24–11 of the North Dakota Century Code provides as follows:

> The debtor under an execution or foreclosure sale of his property shall be entitled to the possession, rents, use, and benefit of the properties sold *from the date of such sale until the expiration of the period of redemption.*

N.D.Cent.Code § 28–24–11 (1974) (emphasis added). Nothing within section 28–24–11 provides that a mortgagor's interest in rents and profits is protected, except during the redemption period following a fore-

closure sale, as against a mortgagee holding an interest based upon a valid assignment of rents. Moreover, the North Dakota Supreme Court has held that a mortgagee is, prior to foreclosure, entitled to receive rents based upon an assignment of rents. *East Grand Forks Federal Sav. & L. Ass'n. v. Mueller*, 198 N.W.2d 124, 128 (N.D.1972); *Skinner v. American State Bank*, 189 N.W.2d 665, 670 (N.D.1971). Although in *Mueller* and *Skinner* no complaint or notice of intent to foreclose had been filed, this court believes that the same result would have been reached by the supreme court if a notice of intent to foreclose had been issued. The clear language of section 28–24–11, which affirmatively provides for a mortgagor's entitlement to rents and profits during the redemption period, can be read no other way.

■ The second issue which the debtors raise regarding the assignment of rents clause in the mortgage is that it was improperly filed in the register of deeds office and that it should have been recorded in the personal property filings because it is a chose in action. Thus, the debtors maintain that the recording does not constitute notice pursuant to section 544(a)(1) and (a)(2) of the Bankruptcy Code and is avoidable.

The debtors sole authority for its position is the dissenting opinion of Justice Teigen in *Skinner*. Justice Teigen took the position that a purchaser of real estate did not have actual or constructive notice of an assignment of rents which was recorded in the office of the register of deeds. *Skinner*, 189 N.W.2d, at 673. However, this court believes implicit in the majority opinion in *Skinner* (which did not address the recording issue raised by Justice Teigen) is the fact that constructive notice pursuant to North Dakota Century Code section 47–19–45 is given by recordation in the register of deeds office. *See* N.D.Cent.Code § 47–19–45 (1978) (depositing with the proper office for record of any instrument shall be constructive notice to all purchasers and encumbrancers); N.D.Cent.Code § 47–19–07 (1978) (any instrument entitled

to be recorded must be recorded by the register of deeds in the county in which the real property is located). *See also Valley National Bank of Arizona v. Avco Development Co., Inc.*, 14 Ariz.App. 56, 480 P.2d 671 (1971) (rehearing denied March 22, 1971, review denied April 20, 1971).

Where there is no express constitutional or statutory declaration on a subject, the common laws apply. *Fitzmaurice v. Fitzmaurice*, 62 N.D. 191, 242 N.W. 526, 527 (1932); N.D.Cent.Code § 1-01-05 (1975). Finding no express declaration as to whether an assignment of rents is an "instrument affecting the title to or possession of real property" recordable in the register of deeds office pursuant to sections 47-19-01 and 47-19-07, the common law is useful in determining the nature of the interests. Blackstone considered rents as one of ten principle incorporeal hereditaments and believed that they must issue out of lands and tenements corporeal. 2 W. Blackstone, Commentaries 22, 41. Other commentators have also considered the right to rent to be an incorporeal thing of real character. 1 A. Tiffany, Landlord and Tenant, 180(2). *See also* 2 F. Pollock and F. Maitland, History of English Law, 125, 132-33 (2d ed. 1951). Likewise, the Eighth Circuit has concluded that section 9-104(j) of the Uniform Commercial Code (adopted in North Dakota as N.D.Cent.Code 41-09-04(10)) expressly precludes an Article 9 security interest in rents. *In re Standard Conveyor Co.*, 773 F.2d 198, 204 (8th Cir. 1985).

Accordingly, the court concludes that the assignment of rents is properly recorded and that the Bank is entitled to receive the rents of the debtors' property, until the redemption period begins to the extent needed to satisfy the underlying debt of $119,183.75 and the interest accruing thereon to the extent that it is allowed under the Bankruptcy Code.

## 2.

The remaining and most difficult issue to resolve in this case is whether the Bank's security interest properly attached to cattle in which Tom claims an ownership interest.

Section 41-09-16 (U.C.C. § 9-203) of the North Dakota Century Code provides that a security interest is enforceable against a debtor or third parties with respect to the collateral, if:

(a) ... the debtor has signed a security agreement which contains a description of the collateral ...

(b) value has been given.

(c) the debtor has rights in the collateral.

N.D.Cent.Code § 41-09-16 (1983).

The parties do not dispute that the debtors signed a security interest covering all cattle now owned or hereafter acquired or that value has been given. The parties do disagree, however, as to whether the debtors had sufficient rights in the cattle in which Tom claimed an interest, to grant a security interest therein.

The starting point in resolving this issue is to determine who actually owned the cattle in question. The cows (calves are excluded) were all branded with the Cook Angus Ranch brand and Jim virtually treated the cattle as his own. North Dakota law provides that "[a] legally registered brand on livestock shall be prima facie evidence that the animal bearing the same is property of the owner of such brand...." N.D.Cent.Code § 36-09-19 (1980). However, a brand on livestock is only prima facie evidence of ownership, which may be rebutted. *Bendfeldt v. Lewis*, 149 Neb. 107, 30 N.W.2d 293, 295 (1948). Because the cattle in question were registered purebred Angus cattle, other reliable means of establishing ownership are available. The registration certificates with the American Angus Association listed Tom as the first owner of all cows in which Tom claims ownership of, except a cow which he purchased from Vermillion Ranch. Personal checks of Tom's were introduced as evidence of his purchase of the Vermillion cow and other cattle purchased on previous occasions, some as 4-H projects. The registration certificates trace many of the contested cattle from Tom's 4-H projects. The 1985 computer print-out from the AAA also indicates that Tom was the owner of the cattle in question. In the instant case,

Tom Cook has rebutted the prima facie evidence of ownership associated with the debtors' brand being carried on some of Tom's cattle. However, the fact that Tom had title to the cattle is not dispositive of the matter before the court, as section 41-09-16 only requires that a debtor has sufficient "rights", in the collateral to grant a security interest.

The Uniform Commercial Code, which has been adopted in North Dakota, does not define what constitutes sufficient rights. Thus, many courts, including the Eighth Circuit in *Rohweder v. Aberdeen Production Credit ·Ass'n.*, 765 F.2d 109 (8th Cir.1985), have attempted to set guidelines in determining whether a debtor has sufficient rights to grant a security interest in particular collateral. In *Rohweder,* the Production Credit Association (PCA) had a perfected security interest in after-acquired livestock of a particular debtor. Based upon its security agreement, PCA asserted that its security interest attached to livestock of Rohweder's which the debtor held on the basis of a "share agreement" with an option to purchase. Pursuant to the share agreement, the debtor would breed, calve, pasture and care for Rohweder's cattle in exchange for receiving forty percent of the calf crop. Rohweder was to remain the owner of the cows and receive the remaining calves. Rohweder took the position that the debtor held the cattle under a bailment, and thus did not acquire sufficient rights in the property to support the attachment of a security interest. The *Rohweder* trial court felt that because the debtor exercised significant control over the cattle and had an option to purchase them, that he had sufficient rights for the security interest to attach. Accordingly, PCA's motion for a directed verdict was granted and the trial court dismissed the matter. Because the evidence in *Rohweder* could support the conclusion that the arrangement was a genuine bailment, the Eighth Circuit treated it as such, reversed the United States District Court and remanded for trial by jury. *Id.,* 112–13. Although *Rohweder* was eventually settled and the legal issues left unre-

solved, the Eighth Circuit's analysis concerning rights in collateral is important to our resolution of the case at bar.

Two of the cases relied on by the Bank in the instant action were also discussed by the Eighth Circuit in *Rohweder: Kinetics Technology International Corp. v. Fourth National Bank,* 705 F.2d 396 (10th Cir. 1983), and *Morton Booth Co. v. Tiara Furniture, Inc.,* 564 P.2d 210 (Okla.1977). In both cases, a debtor who had contracted to manufacture goods from raw products, supplied by the purchaser, became insolvent before the goods were completed. The debtor's secured creditor in each case took possession of the products as inventory collateral. Although the creditors' security interest was held to attach in both instances, the cases are distinguishable from *Rohweder* and the case at bar. *Rohweder,* 765 F.2d, at 112. In *Morton Booth,* the transfer of the raw products constituted a sale, and not a bailment. *Morton Booth,* 564 P.2d, at 212. Pursuant to section 2–401(1) of the Uniform Commercial Code, reservation of title to goods shipped under a contract for sale is limited only to retaining a security interest. N.D.Cent. Code § 41–02–46 (1983); *Rohweder,* 765 F.2d, at 112. Once a sale occurs, the party in possession of the goods has a property interest in them as a matter of law. *Rohweder,* 765 F.2d, at 112. The *Kinetics* court relied on the *Morton Booth* analysis and, in addition, noted that the debtor and purchaser/supplier had entered into a financing arrangement, except raw materials were supplied instead of cash. *Kinetics,* 705 F.2d, at 397–400. *See also,* U.C.C. § 9–102 and Comments. In the instant case, Tom's cattle were, unlike the facts in *Morton Booth,* or *Kinetics,* not part of a contract for sale nor did the debtors have possession of them as a means to secure performance under a financing arrangement.

 The Circuit Court in *Rohweder* held that a true bailment does not grant a debtor sufficient rights to encumber property in a debtor's possession. 765 F.2d, at 112. The burden is on the Bank to demon-

strate that the debtors possess sufficient rights in Tom's cattle for the security interest to attach. *Id.*, at 113. The Eighth Circuit Court stated that the "parties' intent" is crucial in determining whether the debtor had "sufficient rights". *Id.*, at 113. In the case at bar, had Tom and the debtors intended that Tom retain ownership and control relinquishing only possession to the debtors, the debtors would clearly not have had sufficient rights to grant a security interest therein. Although the Eighth Circuit in *Rohweder* did not state what constitutes sufficient rights in collateral, and stated that factors of control over the cattle including right of sale and the option to purchase do not necessarily constitute rights in collateral, it did find that they are relevant in determining whether the parties intended "to transfer an ownership interest" to the debtor. *Id.*, at 113. Thus, the lasting import of *Rohweder* is that the parties' intent is a crucial element in determining whether the holder of another's property has "sufficient rights" to pledge the collateral.

The court recognizes that other courts with similar facts as those present in the Cook matter, have reached varying results. In *Brown v. United States*, 622 F.Supp. 1047 (D.S.D.1985) the plaintiff allegedly gave the debtor $20,000.00 to use to purchase fifty head of cattle for the plaintiff. The money was deposited in the debtor's checking account and later the debtor bought the cattle. The plaintiff, aside from viewing the cattle after they were purchased, had nothing more to do with the cattle. *Id.*, at 1048. The debtor had the unbridled discretion to purchase, care for, and market the cattle. In February, 1982, Farmers Home Administration (FHA) sought to liquidate the debtors' cattle operation. The debtor never told FHA of the arrangement with the plaintiff, and on the basis of FHA's security interest in the cattle, gave FHA the check from the sale of the cattle. The District Court found that a bailment did not exist as no actual or constructive delivery of the cattle ever occurred. *Id.*, at 1049. The *Brown* case is distinguishable from the facts in Cook. In

*Brown*, the plaintiff's money was commingled in the debtors' account *prior* to purchase of the cows and thus no ownership interest in the plaintiff was ever established sufficient to establish a bailment. *Id.*, at 1049. The arrangement appears to have been more in the nature of a loan arrangement rather than a bailment. In Cook, the cattle were commingled *after* Tom owned them and were all *directly* purchased by Tom, or offspring of purchased cattle. Additionally, the debtor in *Brown* had unbridled discretion in the *purchase and sale* of the cattle, with the plaintiff having nothing to do with the cattle. In *Cook*, Jim only had the authority to sell the cattle. He did not ever buy cattle for Tom. Moreover, Tom maintained involvement with the operation. Most importantly, in *Brown* neither party informed FHA that the cattle belonged to the plaintiff until *subsequent* to the time the sale of the cattle had occurred and the debtor had voluntarily turned over the proceeds to FHA. Only later did the plaintiff seek to recover proceeds. Moreover, the *Brown* court stated that it is significant that the debtor *allowed* the cattle to be used to satisfy a personal debt to a third party. In *Cook*, the debtors are *not* allowing cattle to be sold and *have not* acquiesced in the Bank deriving the proceeds thereof. In view of *Rohweder*, this court does not deem it necessary as apparently did the *Brown* court, to determine whether, in all cases, a true bailment exists. The Eighth Circuit in *Rohweder* held that a security interest could not attach to a bailment. However, the *Rohweder* court stopped short of holding that, in the absence of a bailment, a debtor in possession of another's property has sufficient rights to encumber the property. *Rohweder*, 765 F.2d, at 113 (factors of control over cattle, including rights of sale and the option to purchase, *do not necessarily* constitute rights in collateral). *See also Poteet v. Wintergarden Production Credit Association*, 546 S.W.2d 650 (Tex.Civ.App.1977) (facts similar to *Brown* did not give the debtor sufficient rights in the collateral for

a bank's security interest in cattle of the debtors to attach); *National Livestock Credit Corporation v. First State Bank of Harrah*, 503 P.2d 1283 (1971) (Okla.Ct.App. 1972) (a security interest did not attach to cattle which the debtor purchased for another party to keep in the debtor's feedlot).

■ In the absence of clear guidelines from the Eighth Circuit as to what constitutes "sufficient rights" in collateral to grant a security interest, this court finds the discussion and holding of the Seventh Circuit in *Matter of Pubs, Inc. of Champaign*, 618 F.2d 432 (7th Cir.1980), useful in providing additional guidance. In *Pubs*, the Seventh Circuit stated that a debtor may have sufficient rights under section 9–203 of the U.C.C. "if the true owner has *agreed* to the debtor's use of the collateral as security or if the true owner has become *estopped* to deny the creation or existence of the security interest." *Pubs, Inc.*, 618 F.2d, at 436. Moreover, that court said that the requirement of "rights in the collateral" illustrates the general principle that "one cannot encumber another man's property in the absence of consent, estoppel, or some other special rule." *Id.*, (quoting *First National Bank and Trust Co. of Augusta v. McElmurray*, 120 Ga.App. 134, 138, 169 S.E.2d 720, 724 (1969)). *See also Matter of Emergency Beacon Corp.*, 665 F.2d 36, 40 (2nd Cir.1981); *Northwestern Bank v. First Va. Bank of Damascus*, 585 F.Supp. 425, 429 (W.D.Va.1984); *J. White & R. Summers*, Uniform Commercial Code § 23–4 at 916 (2nd ed. 1980); 79 C.J.S.Supp. *Secured Transactions* § 12 at 18 (1974 & Supp.1983). Thus a debtor possesses sufficient rights in collateral if the true owner agrees to the debtor's use of the property as security or if the true owner is estopped to deny creation of the security interest. *Northwestern Bank v. First Va. Bank of Damascus*, 585 F.Supp., at 429.

This court does not believe the facts establish that Tom gave or intended to give the debtors authority to encumber his cattle. Moreover, Jim Cook testified that he did not have authority to encumber Tom's cattle. Accordingly, the court concludes that Tom did not consent to his cattle being encumbered.

The Bank also argues that Tom should be estopped from asserting his rights to the cattle. The general rule is that equitable estoppel, whether it is plead as a defense or as part of a cause of action, must be specially pleaded, or it is waived. *State Bank of Cooperstown v. Newell*, 55 N.D. 184, 212 N.W. 848, 850 (1927); 28 Am Jur.2d *Estoppel and Waiver* § 135 (1966). Nevertheless, allegations in a complaint which amount to an estoppel are sufficient. *Newell*, 212 N.W. 848, at 850. In the case at bar, the Bank did not plead estoppel nor are the allegations in the complaint sufficient to put Tom or the debtors on notice that estoppel would be raised. Accordingly, the Bank has waived its right to raise estoppel as a basis to prevent Tom or the debtors from denying that the debtors had sufficient rights in the collateral for the security interest to attach.

■ Even if the Bank had properly plead estoppel, it failed to establish that the elements of equitable estoppel exist. The requisite elements of equitable estoppel, under North Dakota Law are as follows:

[T]he basic elements of an equitable estoppel, insofar as it relates to the person being estopped, are:

(1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than those which the party subsequently attempt to assert;

(2) the intention, or at least the expectation, that such conduct will be acted upon by, or will influence, the other party or persons; and

(3) knowledge, actual or constructive, of the real facts.

Insofar as related to the party claiming the estoppel, the elements are:

(1) lack of knowledge and of the means of knowledge of the truth as to the facts in question;

(2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and

(3) action or inaction based thereon, of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice.

*Fargo Biltmore Motor Hotel v. Best Western Intern.*, 563 F.Supp. 1022, 1028 (D.N. D.1983) *remanded on other grounds*, 742 F.2d 459 (8th Cir.1984) (quoting *Farmers Cooperative Ass'n. of Churches Ferry v. Cole*, 239 N.W.2d 808, 813 (N.D.1976)).

None of the evidence before the court establishes that Tom knew of the Bank's security agreement covering the debtors' cattle now owned or hereafter acquired. Nor does the evidence establish that Tom intended or expected that his inaction in notifying the Bank of his ownership in the cattle would be acted upon by the Bank or influence its decisions. Insofar as the elements of equitable estoppel relate to the Bank, the record is devoid of any evidence that the Bank acted to its injury, detriment, or prejudice based upon Tom's failure to instruct the Bank that he owned some of the cattle. The Bank believed it had a security interest in 204–215 cows, depending on which point in time and financial statement one is referring to. Tom's cattle were not ever included in those statements. Moreover, Roemmich testified that the Bank relied on the number of cows listed on the financial statement, not the number of cows at the debtors' ranch, as the Bank did not even count the cows at the debtors' ranch prior to the commencement of the bankruptcy.

The Banks final claim that the debtors had sufficient rights to grant a security interest in Tom's cattle is based upon the existence of a partnership or a joint venture.

■ A partnership is an association of two or more persons to carry on, as co-owners, a business for profit. N.D.Cent.Code § 45–05–05 (1978). Under North Dakota law, sharing of profits is an essential element of a partnership. *Oelkers v. Pende-*

*grast*, 73 N.D. 63, 11 N.W.2d 116, 119 (1943). Tom did not share in ranch profits nor did he share in ranch losses, he simply received a minimal amount of income necessary to cover his direct cattle expenses. He was not a co-owner of ranch property; he simply had cows, which he owned, on the ranch. Moreover, he did not file a partnership tax return and never dealt with the Bank. If the court were to find Tom to be a partner, he would be jointly and severally liable for the Cook Angus Ranch debt. *See* N.D.Cent.Code § 45–06–07 (1978). Such a conclusion would be wholly absurd, clearly inequitable, and contrary to the partnership laws of North Dakota.

■ Under North Dakota law, an enterprise does not constitute a joint venture unless the following four elements are present:

(a) *Contribution*—the parties must combine their money, property, time, or skill in some common undertaking, but the contribution of each need not be equal or of the same nature.

(b) *Joint Proprietorship and Control*—there must be a proprietary interest and right of mutual control over the subject matter of the property engaged therein.

(c) *Sharing of Profits But Not Necessarily of Losses:* There must be an expressed or implied agreement for the sharing of profits ... but not necessarily of losses.

(d) *Contract*—there must be a contract, whether expressed or implied, showing that a joint venture was in fact entered into.

*Voltz v. Dudgeon*, 334 N.W.2d 204, 206 (N.D.1983) (quoting *Rehnburg v. Minnesota Homes*, 236 Minn. 230, 52 N.W.2d 454, 457 (1952)). None of the elements of a joint venture have been established by the Bank.

## CONCLUSION

This court is mindful of the potential for abuse that exists in cases such as Cook. However, as the Eighth Circuit stated in

*Rohweder*, "intent" of the parties is the touchstone in resolving this dispute. Although the court has considered the factors of control as indicia of intent, the court has also given much deference to the testimony of Jim and Tom as to their "intent". Tom and Jim, in the opinion of the court, are honest, credible, and straightforward. But for the credibility of the Cooks and but for the registration certificates, AAA reports and other documents establishing that Tom's assertion of ownership is more than an eleventh hour scheme to dispossess a bank of its collateral, the court may well have reached an opposite result. To say that the Cooks' testimony appears credible does not cast doubt on the Bank's testimony. It too is believable and does not contradict that of the Cooks. The case is devoid of any evidence of Jim or Tom Cook attempting to defraud the Bank. The Bank simply did not take sufficient steps to protect its position. The cattle were never counted prior to bankruptcy nor were Tom or Jim ever asked if all of the cattle in the herd belonged to the debtors. Finally, the Bank was not harmed, as it contends, by Jim's cattle eating secured feed; it probably benefited. In essence, Tom owned the factory (cows) with almost all of the proceeds from production going back into the operation which benefited the debtors and, in return, benefited the Bank.

Accordingly, and for the reasons stated herein,

IT IS ORDERED that the Union State Bank of Hazen is entitled to receive the rents of the debtors' property, until the redemption period begins, to the extent needed to satisfy principal on the obligation in the amount of $119,183.75 and interest to the extent allowable under the Bankruptcy Code.

IT IS FURTHER ORDERED that the Union State Bank's security interest did not attach to the cows which the American Angus Association has recorded as being owned by Tom Cook, nor the offspring or proceeds thereof.

LET JUDGMENT BE ENTERED ACCORDINGLY.