**In re Wayne Estes TEEL, d/b/a Teel Music Co., Debtor.**
**BORG–WARNER ACCEPTANCE CORPORATION, Plaintiff,**
v.
**James DUGGER, Trustee, Morgan Leasing Company, Southwest National Bank, U. S. Small Business Administration, Kimball Piano Company, and Conn Music Co., Defendants.**

Bankruptcy No. 780–00027.
Adv. No. 780–0021.

United States Bankruptcy Court,
N. D. Texas,
Wichita Falls Division.

Feb. 5, 1981.

Roger Lee, Wichita Falls, Tex., for plaintiff.

John D. Copeland, James W. Dugger, Wichita Falls, Tex., for defendants.

JOHN C. FORD, Bankruptcy Judge.

## OPINION OF THE COURT

Borg-Warner Acceptance Co. (hereinafter Borg-Warner) commenced this proceeding to establish that its security interest is superior to the interest of Morgan Leasing Company (hereinafter Morgan Leasing) with respect to twenty-two Kimball organs in the possession of the debtor. The debtor was engaged in two music related enterprises in Wichita Falls, Texas. On January 20, 1977, the debtor granted Borg-Warner a security interest in all existing and after-acquired inventory of the debtor at 252 Sikes Center, Wichita Falls. The security interest was duly recorded and perfected on August 31, 1977. On or about May 11, 1978, the debtor purchased the twenty-two Kimball organs along with other organs of the same model that are not the subject of this proceeding. The organs purchased in May 1978 became part of the debtor's inventory and consequently were subject to Borg-Warner's floating lien.

The debtor subsequently transferred the twenty-two disputed organs to his Video School of Music on Seymour Highway in Wichita Falls. At the school, the organs were used as equipment upon which the debtor provided organ lessons.

On or about March 1, 1979, the debtor and Morgan Leasing engaged in several contemporaneous transactions. Morgan Leasing purchased the twenty-two organs at a price of $19,690 from the debtor. The debtor and Morgan Leasing then entered into a lease agreement under which the debtor agreed to lease the organs from Morgan Leasing for an initial thirty-six month rental period. During the initial term the debtor was to pay $622.41/month.

After the initial term had run, the debtor could renew the lease for the remaining useful life of the organs at a rent of $4,000 per annum.

The parties further agreed that the debtor could terminate the lease prior to the end of the initial lease term. However, in the event of premature termination, the debtor agreed to bear any loss or receive any gain resulting from the premature disposition of the organs. The gain or loss on such premature termination was stated to be "the difference between the highest available cash offer received and the Depreciated value ($7,700) plus the product of the Premature Termination Factor ($399.66) times the number of months from the effective date of termination to the end of the lease term."

The debtor closed the Video School of Music in March, 1980, and moved the twenty-two organs back to his retail warehouse at 252 Sikes Center. The debtor testified that even though the music school had failed, he continued to retain possession of the organs and pay the rentals because of the potential liability arising from premature termination. The debtor believed that he would ultimately own the organs as the lessor had told him, "I don't want to be in the piano and organ business."

The debtor filed his original petition for relief on August 4, 1980. On that date, the twenty-two organs that are the subject of this proceeding had been commingled for at least four months with general inventory that was held for sale at the debtor's warehouse.

Morgan Leasing contends that it is the true owner of the twenty-two organs, and alleges that it paid the debtor the full value of the organs. Morgan Leasing argues that the debtor retained possession pursuant to a "bona-fide" lease. Morgan Leasing contends that the debtor has acquired no equity in the leased organs, and therefore, has no property interest upon which Borg-Warner's inventory lien can attach. Borg-Warner seeks to subordinate Morgan Leasing's rights under the following theories.

## I.

§ 2.403(b) of the Texas Business and Commerce Code (U.C.C.) provides: "Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business." Borg-Warner asserts that Morgan Leasing acquiesced in the debtor's retention of the organs in inventory for the four month period preceding bankruptcy. As the debtor was a dealer in musical instruments, Borg-Warner contends that the debtor could transfer the rights on the entruster-lessor to a buyer in ordinary course of business. Borg-Warner then argues that it is a buyer in ordinary course citing as authority, *In the Matter of Samuels and Company, Inc.*, Bankruptcy, 526 F.2d 1238 (5th Circuit, 1976).

In *Samuels*, a secured creditor that held a floating lien on the debtor's inventory was determined to be a good faith purchaser for value. The *Samuels* decision involves the application of § 2.403(a) Texas Business and Commerce Code with respect to a good faith purchaser for value. However, § 2.403(b) Texas Business and Commerce Code applies to purchasers who are buyers in the ordinary course of business.

I find no authority for the proposition that a "good faith purchaser for value" is equivalent to a "buyer in ordinary course of business." The statutory definition of "buyer in ordinary course" precludes creditors from asserting such status: " 'Buying' may be for cash or by exchange of other property or on secured or unsecured credit ... but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt." § 1.201(9) Texas Business and Commerce Code, see also *Sherman v. Roger Kresge, Inc.*, 9 UCCRS 858, 67 Misc.2d 178, 323 N.Y.S.2d 804 (1971). As Borg-Warner, a preexisting secured creditor, is precluded from buyer in ordinary course status with respect to property in the debtor's inventory, it is unnecessary to decide whether Morgan Leasing entrusted the organs to the debtor within the meaning of § 2.403(b) Texas Business and Commerce Code.

## II.

Borg-Warner's second contention is that the Morgan Leasing transaction is in fact a disguised financing arrangement. Under this scenario, the purported sale of the organs was in reality a loan and the contemporaneous lease agreement was nothing more than a security device.

The principal authority on whether a lease is intended as security is § 1.201(37) Texas Business and Commerce Code, which provides in pertinent part:

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. Unless a lease or consignment is intended as security, reservation of title thereunder is not a "security interest." Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessor shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Using the above definition for guidance, the Court in *In re Peacock*, 6 B.R. 922 (Bkrtcy., N.D.Tex.1980), applied a three tier analysis to a lease alleged to be a security device. Under the first tier of analysis, a court is to inquire whether the lease contains a definite obligation to pay rentals during the lease term totaling an amount substantially equivalent to the fair market value of the lease property plus a financing factor as viewed at the time the property is transferred to the lessee. A finding of such an obligation as a precondition to holding the lease is intended as security.

The second tier of analysis is an inquiry into whether the lease agreement contains an option to purchase for a nominal consideration. In such event, a court is compelled as a matter of law to hold that the lease is intended as security.

On the other hand, a finding that the lease agreement contains no option to purchase or an option to purchase for a consideration that is more than nominal does not compel the court to find that the agreement is a true lease. Rather the court is to proceed to a third tier of inquiry into the substance of the lease transaction. Of particular significance is whether the lessor has in effect bargained away the absolute right to retake control and use the leased property.

Applying the three tier analysis to the Morgan Leasing transaction, the following results are reached. The debtor is under a definite obligation to pay a total of $22,406.76 over the thirty-six month initial lease term. Such amount is in excess of the $19,600 that Morgan Leasing paid for the organs. The lease agreement states that the lease is non-cancellable for the initial lease term.

The lessee may opt under the termination agreement to terminate the lease before the conclusion of the thirty-six month period provided that he bear the gain or loss on final disposition of the leased items. I find that the premature termination agreement does not make the lessee's obligation so indefinite as to make the § 1.201(37) definition of security interest inapplicable. The lease obligates the lessee either to pay $22,406.76 over the thirty-six month lease term or to pay any loss under the termination formula resulting from a low price received on final disposition of the property. The arrangement assures that the lessor will receive the original agreed amount regardless of the ultimate disposition of the property. The lessee's obligation is in substance the same as an obligor on a promissory note secured by collateral. Although initially obligated for the full amount of the note, the obligor may opt to default and allow the collateral to be sold, reducing his personal liability to the amount of any deficiency. Consequently the lessee's obligation under the Morgan Leasing agreement is sufficient to meet the first tier of analysis.

Proceeding to the second tier, I find that the lease in question does not contain a nominal purchase option. Consequently, the Court must further inquire into the facts of the case to determine whether in substance the lease functions as a security device.

I find that the bundle of rights retained by Morgan leasing under the agreement are more consistent with those of a vendor-creditor than those of a true lessor. Morgan Leasing has effectively bargained away the absolute right to retake control and use of the twenty two organs. In the event of premature termination, the lessor is obligated to promptly obtain the highest cash offer and sell the organs. The lessor may not simply retain possession of the organs indefinitely. In two recent decisions leases containing premature termination formulas with terms substantially equivalent to the Morgan lease were held to be leases intended as security devices, Matter of Tillery, 571 F.2d 1361 (5th Cir. 1978); In re Tulsa Port Warehouse Co., Inc., 4 B.R. 801, (D.C., N.D., Okl., 1980). In Tulsa Port the Court observed that the premature termination formula made the lessee, not the lessor, the party with the real interest in the final disposition of the leased property. The lessor is assured that it will receive the original agreed amount—no more and no less. The Court in Tillery found that under the termination formula, the lessee had acquired an equity or pecuniary interest in the leased property. Tillery at 1365. The implicit theory behind both decisions is that the lessor had bargained away significant attributes of ownership, in particular, the right to retake possession and use the leased property.

Other terms of the Morgan Leasing agreement confirm that the agreement is not a true lease. In the event the lessee completes the initial thirty-six payments, he may renew the lease for the remaining useful life of the organs at a renewal rental of $4,000 per annum. The renewal feature of the lease is of a nature that the parties at the inception of the lease could have reasonably anticipated that the lessee would exercise it for the remaining useful life of the organs. By definition, where the lessee re-

tains the property for its entire useful life the lessor can have no significant residual proprietary rights in the property, *Leasing Service Corporation v. American National Bank and Trust Co.*, 19 UCCRS 252 (U.S. District Ct., D.N.J. 1976); *In re Pomona Valley INN*, 4 UCCRS 893 (U.S.Dist. Ct., C.D.Ca., 1967).

█ Upon finding that the lessee is obligated to pay the value of the leased organs plus an amount that is apparently interest, and upon finding that the lessor has effectively bargained away its absolute right to retake control and use the organs, I conclude that the Morgan Leasing lease was intended as a security device. Other factors consistent with the conclusion that the lease transaction was a disguised loan are: (1) the risk of loss is on the lessee; (2) lessee required to pay all taxes, insurance, and expenses for repair of the leased property; (3) the sale-leaseback nature of the transaction coupled with the fact that the lessor is not regularly engaged in the business of leasing organs. See *Woods-Tucker Leasing Corp. v. Hutcheson-Ingram*, 626 F.2d 401 (5th Cir. 1980).

█ Having determined that Morgan Leasing is a creditor with a conflicting security interest, the remaining question is whether Borg-Warner has the superior security interest in the twenty-two organs. Morgan Leasing did not file a financing statement; therefore, its lien is unperfected. On August 31, 1977, Borg-Warner filed its financing statement describing its collateral to be "all inventory of goods including ... musical ..." In May of 1978, Borg-Warner's lien attached to the twenty-two organs that were delivered to the debtor's retail warehouse as items of inventory. Upon transfer to the Video School of Music on Seymour Highway, the debtor no longer treated the organs as items of inventory, but rather as items of equipment. The organs were equipment when Morgan Leasing acquired its lien on the organs. Borg-Warner's financing statement does not include "equipment" among the items of

property claimed to be collateral. Nevertheless Borg-Warner retains a perfected security interest in the twenty-two organs as the financing statement correctly described the collateral at the time its lien attached. The creditor is not required to monitor the use of collateral in order to ascertain the proper classification, *McGehee v. Exchange Bank and Trust Co.*, 561 S.W.2d 926 (Tex. Civ.App.—Waco, 1978) ref. n.r.e.; *Commercial Credit Equipment Corp. v. Carter*, 83 Wash.2d 136, 516 P.2d 767 (1973).

█ I find that Borg-Warner's perfected security interest is superior to Morgan Leasing's unperfected security interest. As the purported sale of the organs from the debtor to Morgan Leasing was in substance a loan, Morgan Leasing is precluded from "buyer" status for the purposes of § 9.307(a) and § 9.307(c) Texas Business and Commerce Code, entitled "Protection of Buyers of Goods."[1] The conflict between the two secured lenders is ultimately resolved by the priority rules of § 9.312(e)(1) Texas Business and Commerce Code which states "Conflicting security interest rank according to priority in time of filing or perfection."

---

1. See discussion of § 1.201(9) Texas Business and Commerce Code regarding definition of "buyer," supra.