**MBANK WACO, N.A., Appellant,**

v.

**L. & J., INC. et al, Appellees.**

**No. 10–86–163–CV.**

Court of Appeals of Texas, Waco.

March 31, 1988.

Rehearing Denied June 16, 1988.

P.M. Johnston, Robert T. Swanton, Jr., Sleeper, Johnston, Helm & Fontaine, Waco, for appellant.

Michael Thomas, Holloway Martin, Martin & Thomas, Mexia, for appellees.

## OPINION

THOMAS, Justice.

This dispute is over $312,000 deposited in the registry of the court from proceeds of the cattle sold by MBank–Waco under a security agreement executed by Arnold Young. The court awarded one-half of the money to MBank, defendant-appellant, and one-half to the Mamots, plaintiffs-appellees, who claimed equitable ownership of the cattle under a constructive trust and legal title to the cattle as the real owners of stolen property.

MBank contends it is entitled to all of the money because the security agreement covered after-acquired cattle that Young either owned or had entrusted to his possession by the Mamots. The Mamots argue that their constructive trust extended to all of the cattle in Young's possession because, after tracing money that Young had "stolen" from them to the purchase of some of the cattle, MBank failed to trace and account for the cattle purchased with their stolen funds from the other cattle sold. The crux of their argument is that MBank's security interest did not extend to the cattle covered by the constructive trust and that, in any event, Young was a "thief" who could not pass any title to MBank under the security agreement. Thus, the Mamots also claim the entire $312,000.

The conflict between the parties will be decided by pre-Code rules and principles because MBank, not being a "buyer in ordinary course", cannot rely on the Texas Business and Commerce Code to protect it from the Mamots' undisclosed claims of ownership. However, MBank's status as a good-faith purchaser defeats the Mamots' claim of equitable title under a constructive trust, and equity estops the Mamots from asserting title against MBank, a good-faith purchaser, based on the argument that Young was a thief and could not pass any title to MBank. Therefore, that portion of the judgment dividing the money equally between the parties will be reversed, a judgment will be rendered awarding MBank the money in the registry, and the judgment will be affirmed in all other respects.

Jim and Larry Mamot and their mother, Rosella Mamot, participated for over ten years with Arnold Young in buying and

selling cattle until their relationship foundered in June 1981. The Mamots lived in St. Libory, Nebraska, where they had a large farming, cattle and feedlot operation. Larry was responsible for their farming interests and Jim operated the family's cattle business. Rosella Mamot, who was retired, owned 96% of the stock of L. & J., Inc., a Nebraska corporation, through which the Mamots also bought and sold cattle. References to the "Mamots" include the Nebraska corporation.

Young lived in Limestone County, Texas, where he had ranched and operated a large cattle business for over 25 years. He was in the "order buying business", through which he regularly bought and sold cattle for others on a commission basis. Young also dealt in "feeder cattle", which he placed in feed lots in Texas and other states to be fattened for sale, and also grazed calves and yearlings, called "stocker cattle", on his own ranch and on leased pasturage. These stocker cattle would be placed on grass in the fall and then rounded up and sold the following spring. This spring-to-fall period was referred to during the trial as a "cattle year." Young, who handled 150,000 to 175,000 cattle in all three phases of his business during the 1979–1980 and 1980–1981 cattle years, operated individually and through several closely-held companies, including Arnold Young Cattle Co., Inc., Arnold Young & Son, Inc., and Arnold Young Trucking Co.

The Mamots and Young had apparently built their business relationship over many years upon mutual trust, particularly on the part of Jim Mamot. It was the classic "a-man's-word-is-his-bond" type of a relationship. The parties never reduced their business relationship or any particular Mamot–Young cattle deal to a written agreement, nor did the Mamots ever attempt to protect themselves by perfecting a lien under the Texas Business and Commerce Code on any cattle that Young purchased with their money.

Jim Mamot and Young usually dealt with each other over the phone, with large sums of the Mamots' money being forwarded to Young to buy Mamot–Young cattle based on scant, if any, documentation from Young. However, Jim Mamot would come to Limestone County in March of each year to look at the Mamot–Young cattle and to "check the business, [see] how [Young] was doing, check the people around him, see what people thought of him, see if everything looked okay." The Mamots authorized and knew that Young was branding all of the cattle purchased with their money with his own registered "X" cattle brand, and Jim Mamot admitted that one could not tell, just by looking at the cattle in the pasture or feedlot, that the Mamots had any ownership interest in them.

On "rare" occasions, Young would furnish the money to purchase cattle for a Mamot–Young cattle deal, but the money was "usually" furnished by the Mamots, and Young "usually" did the buying and selling and furnished the pasture to graze the stocker cattle. The profit or loss on each deal was usually shared between the parties on a one-third or one-fourth basis, although Young said that "each deal was different."

Jim Mamot gave a brief description of how a typical Mamot–Young cattle deal would occur:

Q. During the course of dealings with [Young] in the past had these transactions normally been over the phone?

A. Yes.

Q. What documentation would there be?

A. Well, if we did buy the cattle normally [Young] would send us a bill for the cattle and we would send him a check.

Q. Before he bought the cattle for you would he call you up and tell you he was going to buy cattle for you?

A. Yes. If we wanted some cattle we [definitely] would figure out what the price and what the kind of cattle they were first before we agreed to buy the cattle.

Mamot would also send large amounts of money to Young to pay feed bills on Mamot–Young cattle being fattened in feedlots. These checks were usually made pay-

able to Young who would then pay the feed bill.

In all of their dealings prior to the 1980–1981 cattle year, Young had always bought the Mamot–Young cattle with the Mamots' money as the parties had agreed over the phone. However, unknown to the Mamots, Young had suffered huge losses from the "forward contracting" of stocker cattle in the 1979–1980 cattle year. MBank described this speculative business arrangement in its brief:

> Young would enter into contracts with farmers and ranchers, generally in the fall, to purchase cattle that would remain with the farmer or rancher on grass until sometime the next spring. A downpayment was made by Young, and he purchased the cattle, agreeing to finish paying for them when they were picked up the next spring, the price being a certain price per pound. This was a fixed price. At about the same time, a contract was entered into by Young[,] as seller, and [Heinold Cattle Market], whereby these same cattle would be sold for delivery to Heinold in the spring at the same time delivery was accepted by Young from his sellers, but the price to be paid by Heinold to Young was open at the time the contract was made and was tied to the Chicago futures market, which price could be set by Young during certain periods of the contract.... [D]uring the cattle year 1979–80, approximately 25,000 head of cattle was handled [by Young] under these forward-contract arrangements. The cattle market fell considerably during that period of time and Young suffered a loss in excess of $3,000,000 on the 25,000 head transaction, in that his obligation to pay was that much more than the price he could get from Heinold.

Approximately 3,000 of the cattle that Young sold and delivered to Heinold under the forward-contracts in the 1979–1980 cattle year were Mamot–Young cattle that had been purchased with money supplied by the Mamots. In fact, Young still owed the Mamots approximately $832,000 from the sale of these cattle to Heinold as the 1980–

1981 cattle year approached, but he did not have the money to pay them.

Young concocted a scheme to deceive the Mamots. Beginning in August and through December 1980, he called Jim Mamot on several occasions to tell him that he had bought or could buy Mamot–Young cattle for the 1980–1981 cattle year. The details of these purchases, such as the number, type of cattle, and weight, were all fictitious, although Young used current market prices and other realistic details to lend authenticity to his scheme. Based on these phone conversations and consistent with their past dealings, Mamot sent Young approximately $1,800,000 to pay for the cattle and for feed bills. However, Young never intended to purchase, nor did he purchase, any of the Mamot–Young cattle he had described to Mamot over the phone in the fictitious cattle deals. Instead, he returned approximately $832,000 of the $1,800,000 to the Mamots under the guise of paying them what they were owed from the 1979–1980 cattle year. He deposited the balance of the money, approximately $1,000,000, in his general operating account, out of which he operated all phases of his cattle business in the 1980–1981 cattle year.

When Jim Mamot came to Limestone County in March 1981, Young drove him around to look at cattle which Mamot thought were the cattle that Young had purchased with the Mamots' $1,800,000 for the 1980–1981 cattle year. He admitted that these cattle were branded with Young's "X" brand.

Arnold Young had a long-standing financial relationship with MBank and its predecessor, the First National Bank of Waco. He was described as one of the bank's "bigger customers", and had earned the reputation with the bank of having "always handled his affairs properly." Young, who had apparently borrowed large sums to fund his cattle operation over the years, paid off his debt to MBank in 1978.

However, in mid-1979. MBank granted him a $2,000,000 line of credit, which was increased by another $150,000 in January 1980, to finance his cattle business for the

1979–1980 cattle year. On July 27, 1979, Young signed, individually and as an officer of Arnold Young & Son, Inc., a security agreement giving MBank a security interest in "[a]ll cattle now owned or hereafter acquired, including but not limited to attached list ... All branded with $X$ on left side." The attachment, entitled "Arnold Young List of Cattle as of 7–27–79," listed 615 head at Mamot Feed Yard in St. Libory, Howard County, Nebraska; 493 head at Carter Feed Yard in Plainview, Texas; 3,950 head at H & H Feed Lot in Roscoe, Texas; 1,382 head "located in and around the *Groesbeck area*," in Limestone County, Texas; and 472 head located "between *Wortham and Streetman*" in Freestone County, Texas. The cattle in the feed lots were described by either a lot or pen number, as well as by whether they were steers, heifers or bulls. The cattle in Limestone and Freestone counties were described as steers, heifers, cows, calves or bulls. MBank perfected their security interest in these cattle under the Texas Business and Commerce Code by filing the required financing statements.

On May 14, 1981, Young told Sam Thompson, his loan officer at MBank, that he had sold and delivered "a lot of the cattle" covered by the bank's security agreement to Heinold in 1980, and Thompson immediately notified his superiors that the bank "had a problem with [its] collateral." MBank's chief executive officer, its executive vice-president, and Thompson drove to Groesbeck to meet with Young that same day. According to the bank officers, Young told them that he still owned some cattle, but that he was going to sell the herd and use the proceeds to reduce his $1,795,000 debt to MBank.

Young told the Mamots on June 3 that he had not purchased the cattle which he had described in the fictitious deals. On June 8 the Mamots and their Nebraska corporation filed suit in Limestone County against Young, his companies, and MBank, which was then rounding up all cattle branded with Young's "X" brand for the purpose of selling them and applying the proceeds to reduce his debt to the bank. The court issued a temporary restraining order to prevent MBank from disposing of the cattle, but the parties later agreed that MBank would sell the cattle and deposit the proceeds into the registry of the court. The $312,000, which the court divided equally between MBank and the Mamots, is the net proceeds remaining in the registry.

Both sides complain that the court erred when it split the money evenly between the parties. The Mamots claim the $312,000 based on two principal contentions: (1) they claim equitable ownership under a constructive trust of *all* of the cattle sold by MBank; and (2) they contend that MBank could not acquire any title from Young because he was a "thief" who could not pledge to MBank under the security agreement any cattle purchased with their "stolen" money.

However, MBank argues that: (1) the evidence was legally and factually insufficient to establish a constructive trust in the Mamots' favor over any of the cattle in Young's possession; (2) the Mamots were estopped from asserting any claim of ownership as a matter of law; (3) Young and the Mamots were either partners or joint venturers as a matter of law, and the Mamots had clothed Young with apparent authority to pledge the cattle to MBank; and (4) the "entrusting" provision of section 2.403(b) cut off any claim of legal or equitable ownership by the Mamots.[1] Thus, MBank claims all of the $312,000.

MBank argues that its lien on after-acquired collateral extended to all cattle which the Mamots may have owned but had entrusted to Young's possession. Section 2.403 provides in part:

> (b) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a *buyer in ordinary course of business.*
>
> (c) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition ex-

---

1. All section references are to the Texas Business and Commerce Code. Tex.Bus. & Com. Code Ann. §§ 1.101–36.26 (Vernon 1968 & Supp.1988).

pressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

§ 2.403(b), (c) (Vernon 1968) (emphasis added). Assuming the Mamots established legal or equitable ownership of the cattle in Young's possession, MBank nevertheless contends the evidence conclusively established that they had entrusted these cattle to Young's possession within the meaning of section 2.403(b). Young had the *power*, MBank argues, to transfer (i.e., pledge) all of the Mamots' rights to MBank under the security agreement, regardless of whether he had used criminal means to obtain possession from the Mamots.

MBank cannot rely on the entrustment provision of section 2.403(b) because it does not fit within the Code definition of "buyer in ordinary course of business", which excludes a pre-existing creditor asserting a security interest "in total or partial satisfaction of a money debt." *See* § 1.201(9) (Vernon Supp.1988); *In re Teel*, 9 B.R. 85, 87 (Bkrtcy.N.D.Tex.1981); Warren, *Cutting Off Claims of Ownership Under the Uniform Commercial Code*, 30 U.Chi.L. Rev. 469, 472–73 (1963). Because MBank was not a "buyer in ordinary course", there is no need to decide whether the Mamots entrusted cattle to Young's possession within the meaning of section 2.403(b). *See In re Teel*, 9 B.R. at 87; § 2.403(b) (Vernon 1968). However, entrustment will be discussed later in the opinion as it relates to resolving a pre-Code conflict between a good-faith purchaser and a third party asserting an undisclosed ownership claim.

The Code does not protect a buyer from undisclosed claims of ownership unless he qualifies as a "buyer in ordinary course." *See* Warren, *Cutting Off Claims of Ownership Under the Uniform Commercial Code*, 30 U.Chi.L.Rev. at 492. Consequently, a buyer who is outside of the ordinary course of commerce, either because he is not buying from a "merchant" or, as in

MBank's case, because he is a pre-existing secured party, must rely on pre-Code rules and principles to defeat undisclosed ownership claims of third parties. *See id.* at 475.

■ A pre-Code conflict between a good-faith purchaser and a third party asserting equitable ownership of personalty under a constructive trust was resolved in favor of the good-faith purchaser. *See Fitz–Gerald v. Hull*, 150 Tex. 39, 237 S.W.2d 256, 263 (1951). The parties differ on whether the evidence was legally and factually sufficient to support a constructive trust in the Mamots' favor or whether the evidence established a constructive trust as a matter of law.[2] This evidentiary dispute becomes irrelevant if MBank qualified as a good-faith purchaser because, assuming a constructive trust was established as a matter of law, the Mamots' claim of equitable ownership would nevertheless yield to MBank's superior right as a good-faith purchaser. *See id.*

"A purchaser of goods acquires all title which his transferor had or had power to transfer." § 2.403(a) (Vernon 1968). This portion of the first sentence in section 2.403(a) restates and continues the general rule under pre-Code caselaw. *Id.* Comment 1. MBank, a Chapter Nine secured party, automatically qualified as a "purchaser" under section 2.403(a) because "purchase", defined in section 1.201(32), includes taking by a voluntary mortgage, pledge or lien. *See* §§ 1.201(32)–(33), 2.403(a) (Vernon 1968); *Matter of Samuels & Co., Inc.*, 526 F.2d 1238, 1242 (5th Cir.1976). Furthermore, "good faith" under the Code merely requires "honesty in fact" and, for purposes of section 2.403(a), "reasonable commercial standards of fair dealing." §§ 1.201(19), 2.103(2) (Vernon 1968); *Matter of Samuels & Co., Inc.*, 526 F.2d at 1243.

■ There was no evidence that: (1) MBank acted in bad faith in its dealings with Young; (2) MBank breached any obligation which caused the Mamots' loss; (3) MBank's security agreement or Young's

---

**2.** None of the court's findings related to a constructive trust, and the court did not mention a constructive trust in its conclusions of law or decree a constructive trust in its judgment.

debt was a product of bad faith or motivated by a desire to defeat the Mamots' claim; or (4) MBank exercised any control over Young's cattle business or suggested that he defraud or deceive the Mamots. MBank acted with "honesty in fact" and within "reasonable commercial standards of fair dealing." This analysis of the evidence, which is the analysis used in *Samuels*, conclusively establishes that MBank was a good-faith purchaser from Young. *See Matter of Samuels & Co., Inc.*, 526 F.2d at 1243–44. Therefore, assuming the Mamots had conclusively established equitable ownership under a constructive trust of some or all of the cattle in Young's possession, their equitable title would still be inferior to MBank's rights as a good-faith purchaser. *See Fitz–Gerald*, 237 S.W.2d at 263.

■ An additional reason exists for denying the Mamots superiority based on their claim of equitable title under a constructive trust. A person claiming equitable ownership under a constructive trust is a lien creditor with respect to the property covered by the trust. *Meadows v. Bierschwale*, 516 S.W.2d 125, 133 (Tex. 1974). Therefore, assuming that the Mamots conclusively established a constructive trust, their status as an unperfected lien creditor would yield to MBank's superior status as a secured party under Chapter Nine. *See* § 9.201 (Vernon Supp.1988). Points one through fifteen in MBank's brief, attacking the evidentiary support for a constructive trust, are overruled.

■ The Mamots' remaining contention, that Young was a "thief" who could not pass any title to the cattle to MBank, must also be decided under pre-Code principles and caselaw because, not being a "buyer in ordinary course", MBank cannot rely on the Code to protect it from the Mamots' undisclosed ownership claim. *See* Warren, *Cutting Off Claims of Ownership Under the Uniform Commercial Code*, 30 U.Chi. L.Rev. at 492.

The pre-Code common-law rule is that a purchaser, regardless of his innocence and good faith, cannot acquire any title from a thief. *Olin Corp. v. Cargo Carriers, Inc.*, 673 S.W.2d 211, 216 (Tex.App.–Houston [14th Dist.] 1984, no writ). Thus, the true owner can recover the stolen property or its value even from a good-faith purchaser. *Id.* at 217. Entrusting possession of personalty to another will not, in and of itself, estop the true owner from retrieving the property from a good-faith purchaser. *Case v. Jennings*, 17 Tex. 662, 674 (1856). However, equity estops the true owner from recovering stolen property or its value from a good-faith purchaser if, by some act or omission, he has entrusted possession *and* vested apparent ownership in the seller. *See McKinney v. Croan*, 144 Tex. 9, 188 S.W.2d 144, 146 (1945). Therefore, MBank's status as a good-faith purchaser would not prevent the Mamots from recovering the proceeds from the sale of their cattle, assuming they were stolen, unless equity estopped them from asserting their title. *See id.*

■ MBank plead estoppel as an affirmative defense, and also alleged the Mamots were negligent when they allowed Young to place his brand on cattle bought with their money. The court found that the Mamots, for several years prior to and including the 1980–1981 cattle year, had authorized Young to place his brand on any cattle purchased with their money. Undisputed evidence conclusively established that the Mamots allowed Young to have possession in Texas of cattle purchased with their money. Likewise, Jim Mamot admitted that one would assume that Young owned the cattle carrying his brand and that one could not tell, just from looking at the cattle, that the Mamots had any ownership interest in them.

■ A recorded brand, such as Young's, is evidence of ownership of the cattle on which it is placed. *See DeGarca v. Galvan*, 55 Tex. 53, 57 (1881). By voluntarily entrusting Young with possession and allowing him to place his brand on the cattle, the Mamots clothed him with indicia of ownership of the cattle purchased with their money. Accordingly, their conduct estopped them as a matter of law from asserting legal title to the cattle or to the proceeds of their sale in the hands of

MBank, a good-faith purchaser. *See McKinney*, 188 S.W.2d at 146.

MBank's twenty-seventh point, that the Mamots were estopped from asserting any claim to the proceeds in the registry of the court, is sustained. The sixteenth through twenty-fifth points, in which MBank asserts protection under the entrustment provision of section 2.403(b), are overruled. Point twenty-six, raising negligence as a bar to the Mamots' claim, and points twenty-eight and twenty-nine, raising the issue that the law of agency precluded recovery by the Mamots, are not reached.

The judgment granting the Mamots and L. & J., Inc. a recovery is being reversed and a judgment rendered in favor of MBank for the entire $312,000. Therefore, any question about the Nebraska corporation's standing, as an unlicensed foreign entity, to sue in Texas is no longer material, and points thirty through thirty-four need not be decided. Likewise, point thirty-five is not reached because reversal of the judgment cures MBank's complaint that the court applied an erroneous legal standard when it divided the $312,000 equally between the parties.

MBank complains in points thirty-six through thirty-eight about the court finding and concluding that it failed to prove its counterclaim against the Mamots. It alleged in the counterclaim that the Mamots had sold cattle in their Nebraska feedlot which were owned by Young and subject to the bank's security agreement. The court found that MBank failed to offer any proof of the number of cattle sold, the manner of their disposition, or of the disposition of the sale proceeds. These points are overruled because MBank failed to introduce any evidence that the Mamots ever sold any cattle covered by the security agreement.

MBank, a good-faith purchaser, takes free of the Mamots' claim of equitable ownership under a constructive trust as a matter of law under pre-Code rules. Furthermore, pre-Code principles of equity conclusively estop the Mamots from asserting against MBank, a good-faith purchaser, legal title to the cattle in Young's possession or to the proceeds from their sale. The Mamots' three cross-points, complaining of the award of $156,000 to MBank, are overruled. The portion of the judgment awarding the Mamots and L. & J., Inc. $156,000 of the funds in the registry of the court is reversed, and a judgment is rendered awarding MBank all of the proceeds in the registry. The judgment is affirmed in all other respects.