**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 7 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

IN RE: CHAPTER 12 ESTATE OF
ROBERT NICHOLAS HARRIS,

     Plaintiff - Appellee,

v.

BRAD HARRIS; DELIGHT HARRIS;
CHARLENE HARRIS; FARM
SERVICE AGENCY, UNITED
STATES DEPARTMENT OF
AGRICULTURE,

     Defendants-Cross-Claimants -
     Appellees,

v.

THE BEVERLY M. MCPHERSON
TRUST, formerly known as the Roe
M. McPherson Trust, as a successor in
interest to Roe M. McPherson, Jr,

     Defendant-Cross-Defendant -
     Appellant.

No. 99-8020
and 99-8030

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 98-CV-83-D)**

---

SUBMITTED ON THE BRIEFS:
Ken McCartney of Law Offices of Ken McCartney, P.C., Cheyenne, Wyoming,
for Plaintiff - Appellee Robert Nickolas Harris, Jr.

Andrew W. Baldwin of Baldwin & Crocker, P.C., Lander, Wyoming, for Defendants - Cross-Plaintiffs - Appellees Brad Harris, Delight Harris and Charlene Harris.

David D. Freudenthal, United States Attorney, and Nicholas Vassallo, Assistant United States Attorney, Cheyenne, Wyoming, for Defendant/Cross-Plaintiff - Appellee Farm Service Agency, United States Department of Agriculture.

Mark J. White and Jill E. Kucera, of White, White & Kucera, P.C., Riverton, Wyoming, for the Appellant.

---

Before **LUCERO**, Circuit Judge, **MCWILLIAMS**, Senior Circuit Judge and **BROWN**[*], Senior District Judge.

---

**LUCERO**, Circuit Judge.

---

This case involves ownership interests in approximately 200 head of cattle bearing multiple brands; it requires us to ascertain the effect of re-branding, under Wyoming's cattle branding statutes, on those interests, which are subject to a share agreement, a security interest, and, according to appellant, its judgment lien. Although the facts of this case are somewhat peculiar, involving questions of the rights of a judgment creditor in re-branded cattle and the effect of tribal grazing regulations, we find guidance in the opinions of other courts, which have considered the seemingly common situation of creditors attempting to assert

---

[*] The Honorable Wesley E. Brown, Senior District Judge of the District of Kansas, sitting by designation.

security interests in animals run, but not owned, by a debtor pursuant to an agreement with a third party. Based on those precedents and the record before us, we conclude the district court did not err in granting summary judgment on the questions of ownership and estoppel. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and Fed. R. App. P. 4(a) and affirm.

## I

The precise number of cattle involved is 181: 172 currently branded with the "J-N-J" and "M-V" brands, and nine branded with "Arrows" and "W Diamond" brands. (Appellant's App. at 3-4.) To separate the interests therein, we begin by exploring the history of the various parties' relations.

In 1991, Roe McPherson, predecessor in interest to defendant-appellant the Beverly McPherson Trust, obtained a default judgment against Robert Nicholas Harris ("Nick Harris") in the Wind River Court of Indian Offenses of the Shoshone and Arapahoe Tribes, Fort Washakie, Wyoming. This judgment is now worth, after the accrual of interest, approximately $100,000.

Brad and Charlene Harris are adult children of Nick Harris; Delight Harris is the wife of Brad Harris. The Harrises are enrolled members of the Wind River Indian Reservation. Nick and Charlene have their own registered livestock brands, as do Brad and Delight together. As of the relevant events in this case, Brad and Delight Harris were engaged in the cattle business. In the course of this

business, in 1994 and 1995, the Farm Service Agency of the United States Department of Agriculture ("FSA")[1] loaned Brad and Delight Harris $194,000 to purchase 172 head of cattle, on which FSA filed financing statements.[2] The financing statements did not identify Nick Harris as debtor nor his brands as collateral. Brad and Delight initially branded the cattle with their brands.

In 1997, Brad and Nick Harris arranged for Nick Harris to graze the cattle on his allotment on the Wind River Indian Reservation. The two memorialized their arrangement in an unrecorded "partido" or share agreement,[3] providing for "a 60/40 split on the calf sales only," with 60% going to Nick and 40% to Brad. (Appellant's App. at 69.) The agreement further provided that "[t]he cows will be branded with Nick's 'J-N-J' . . . brand on the right hip," but that "[a]ll of Brad and Delight's cattle will still have the 'M-V' . . . brand on the left hip." (Id.) Brad and Delight characterized the purpose of this arrangement as reducing their

---

[1] Formerly the Farmers Home Administration ("FmHA").

[2] Charlene Harris also obtained, in 1996, nine head of cattle with a loan from Defendant Norwest Bank of Gillette. Prior to the relocation of the cattle to the Wind River Reservation, Charlene's brother Brad had possession of these cattle.

[3] See, e.g., Lujan v. McCuistion, 232 P.2d 478, 479 (N.M. 1951) (discussing a partido contract). Our review of the Wyoming statutes governing livestock does not reveal a requirement, such as is present under Colorado law, that such contracts, to be valid, must be filed or recorded. Cf. Colo. Rev. Stat. § 35-54-106 (1999).

expenses on the cow herd, while giving Nick Harris an incentive to care for the cows and calves based on his interest in the calf crop.

Brad and Delight Harris proposed this arrangement to FSA, characterizing it as "a 60-40 split on the calf crop only." (Id. at 71.) In correspondence with the FSA, they stated that "[d]ue to regulations the cattle will have to have the brand of the allotment holder," Nick Harris, but stated that "the FSA's security interest in the cows will not be compromised." (Id.) Pursuant to this arrangement, they gave to FSA Credit Supervisor Carl Ericsson a blank brand transfer document.

In accordance with the share agreement, Brad and Delight's 171 cattle were branded on one hip with Nick Harris's brand (the "J-N-J" brand) but retained Brad and Delight's brand (the "M-V" brand) on the opposite hip. The additional nine cattle were apparently branded with Nick Harris's "W Diamond" brand but retained Charlene Harris's "Arrows" brand. Prior to relocating the cattle, Nick Harris executed but did not record a transfer of the "J-N-J" brand to Brad and Delight Harris. The cattle were then relocated to graze under the supervision of Nick Harris on reservation lands.

At the time of seizure of the cattle, Nick Harris held a Bureau of Indian Affairs ("BIA") grazing permit to graze animals on Indian and federal lands, as well as an assignment from the Shoshone and Arapahoe Tribes to graze cattle on certain lands. These permits and assignments, pursuant to tribal and BIA rules,

provided that only livestock owned by the holder could be run on the land in question.

By means not apparent from the record before us, the Trust learned of Nick Harris's possession of the cattle and went to tribal court in an attempt to seize them and have them sold to satisfy its judgment. On January 22, 1998, the tribal court entered an "Order in Aid of Execution" of judgment providing for seizure of any livestock bearing Nick Harris's brands. Following inspection by a brand inspector, who stated the cows were branded with "relatively fresh" brands registered under the name of Nick Harris (id. at 27), and a lien search which identified no liens tied to cattle bearing Nick Harris's brands, the Trust seized the cattle. Following the seizure, Nick Harris transferred the "J-N-J" brand to Brad and Delight Harris.[4]

Nick Harris unsuccessfully sued in tribal court, seeking return of the cattle or a stay of their sale. Brad and Charlene Harris attempted, also unsuccessfully, to intervene in the trial court proceeding. In April of 1998, Nick Harris filed for bankruptcy.

Upon filing of the bankruptcy proceedings, the Trust filed an adversary proceeding to determine the extent and validity of claims against the cattle. The

---

[4] Apparently, the brand transfer was earlier executed in blank and the names later filled in.

bankruptcy court determined the matter should be heard by the district court in a non-bankruptcy forum, and defendants Brad, Charlene, and Delight Harris, as well as FSA and Norwest Bank of Gillette, were made parties to the suit.  The parties filed cross-motions for summary judgment in district court, which, after hearing oral argument, entered a telephonic oral ruling in favor of defendants on the parties' cross-motions for summary judgment.

The Trust raised various arguments, including estoppel and res judicata theories, in support of the position that it enjoyed a judgment lien against the cows based on the outstanding judgment against Nick Harris.  Responding to the Trust's claim that the tribal court ruling made ownership of the cattle a matter subject to the doctrine of res judicata, the district court found

> that Brad and Delight Harris and the United States were not parties to the tribal court action.  Therefore, res judicata does not preclude advancement of their claims.

(Id. at 134.) [5]

Addressing Trust's judicial estoppel claims, the court rejected them on the

---

[5] Although appellant asserts in passing that "[t]he Tribal Court's determination that the cattle were owned by Nick Harris and subject to seizure should be granted deference under the Doctrine of Res Judicata," (Appellant's Br. at 26), it cites no authority and advances no detailed arguments for that position. We therefore do not disturb the district court's conclusion that res judicata was inapplicable due to lack of identity of the parties. See Burlington N. R.R. Co. v. Dunkelberger, 918 P.2d 987, 992 (Wyo. 1996) (setting forth requirements for application of the doctrine of res judicata).

ground that Brad and Delight Harris had never, unlike Nick Harris, advanced the claim that Nick Harris owned the cattle. The court then inquired: Who owns the cattle, Nick Harris or Brad, Delight, and Charlene Harris? In answering this question, the court accurately and succinctly summarized the threshold issue in this case:

> If Nick Harris owns the cattle or owned them when they were seized, the trust may proceed against the cattle to satisfy its default judgment against Nick Harris. On the other hand, if the Harris children own the cattle, the trust may not proceed against them, and the cattle are subject to their original security interests.

(Id. at 135.) Concluding that Nick Harris's brand on the cattle, combined with his running the cattle on tribal land under tribal regulations, created a "strong presumption" of his ownership of the animals, the district court nevertheless found the remaining record evidence "overwhelmingly demonstrates that ownership remained in Brad, Delight and/or Charlene Harris." ( Id. at 136.) The court further found, without extensive discussion, "that the purchase money security interest held by the United States in this case was not affected by the relocation or additional branding of the cattle." (Id. at 139.) The Trust now appeals.

**II**

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and Fed. R. App. P. 4(a). Appellant's notice of appeal was filed on February 17, 1999, sixty-one

- 8 -

days after the entry of judgment.    See Fed. R. App. P. 4(a)(1)(B).  On March 16, 1999, this Court issued an order to show cause why the appeal should not be summarily dismissed as untimely.  Shortly thereafter, on March 22, the district court granted appellant an extension of time until March 29 to file its notice of appeal, and appellant filed such notice on March 25, 1999.  Federal Rule of Appellate Procedure 4(a)(5)(C) permits the district court to extend the time to file a notice of appeal if a party so moves within thirty days after the prescribed time or ten days after the date of its order granting such extension, whichever is later.  That was done by appellant in this case, and the district court's proper Rule 4(a)(5)(C) extension confers jurisdiction upon this Court.

### III

We "review[] the grant or denial of summary judgment de novo, applying the same standard of review as the district court."  Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).  That standard is set forth in Fed. R. Civ. P. 56(c): Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits on file, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In reviewing a summary judgment motion, the court is to view the record "in the light most favorable to the nonmoving party."  Thournir v. Meyer, 909 F.2d 408, 409 (10th Cir. 1990)

(citation omitted). The purpose of summary judgment, unlike that of a motion to dismiss, is to determine whether there is evidence to support a party's factual claims; unsupported conclusory allegations do not create a genuine issue of fact. See United States v. Simons, 129 F.3d 1386, 1388 (10th Cir. 1997).

**A**

Confronted with somewhat analogous circumstances and claims, the court in Union State Bank of Hazen v. Cook (In re Cook), 63 B.R. 789, 795 (Bankr. D.N.D. 1986), observed that "[t]he starting point in resolving this issue is to determine who actually owned the cattle in question." If the district court was correct in determining that Nick Harris did not own the cattle, then, absent application of the doctrine of estoppel, appellant, as a judgment creditor, has no interest in the animals. Wyoming law establishes that a judgment creditor cannot become an "innocent purchaser" of property and therefore does not enjoy the special legal protections due such a purchaser. Sorenson v. Howell, 241 P. 1068, 1071 (Wyo. 1925); see also 77 Am. Jur. 2d Vendor and Purchaser § 435 (1997) ("[A] judgment creditor is not entitled to protection as a bona fide purchaser.") (citations omitted). It is because of this principle that the case of First Nat'l Bank of Holdenville v. Kissare, 98 P. 433, 434 (Okla. 1908), on which appellant relies, is inapplicable; the holding of that case depends on the protections due a bona fide purchaser.

1.    The Statutory Presumption of Ownership and Its Rebuttal

Under Wyoming law, the branding of an animal with a recorded brand creates prima facie evidence of ownership. See Wyo. Stat. Ann. § 11-20-108 (Michie 1999).[6] Likewise, under tribal regulations, "[a] permittee who brands his/her cattle with a brand duly registered with the Wyoming Livestock Board in his/her name is presumed to be the sole and bona fide owner of the livestock." (Appellant's App. at 41.)    Therefore, the presence on the cattle of brands registered to Nick Harris creates a presumption that he owns the animals. We must consider, however, as did the district court, the evidence offered by appellees to rebut this prima facie evidence of ownership.

Although Wyoming case law does not specify whether and how the prima facie evidence of ownership established by Wyo. Stat. Ann. § 11-20-108 may be rebutted, other states have similar statutory schemes, prior judicial interpretation of which proves useful to our task. In considering questions of state law, "[w]here no state cases exist on a point, we turn to other 'state court decisions, federal decisions, and the general weight and trend of authority.'" Barnard v.

---

[6] Wyo. Stat. Ann. § 11-20-108 provides:
A certified copy of any brand recorded in the office of the board is prima facie evidence of ownership of animals branded therewith for that species of livestock recorded by the board. The brand shall be received as evidence of ownership in all legal proceedings involving title to the animal.

Fireman's Fund Ins. Co., 996 F.2d 246, 248 (10th Cir. 1993) (quoting Armijo v. Ex Cam, Inc., 843 F.2d 406, 407 (10th Cir. 1988)). North Dakota law, for example, provides, in similar statutory language, that a brand creates prima facie evidence of ownership. See N.D. Cent. Code § 36-09-19 (1980); Cook, 63 B.R. at 795.[7] "However, a brand on livestock is only prima facie evidence of ownership, which may be rebutted." Cook, 63 B.R. at 795 (citing Bendfeldt v. Lewis, 30 N.W.2d 293, 295 (Neb. 1948)).

Because the Wyoming statute provides only for "prima facie" evidence of ownership, Wyo. Stat. Ann. § 11-20-108, that evidence may be rebutted. See id. As the district court recognized, the record in this case contains substantial rebuttal evidence—most significantly, the share agreement and the evidence of older brands—so as to preclude summary judgment in favor of the Trust. The share agreement, in particular, constitutes strong evidence that Brad and Delight retained ownership interests in the cattle, while Nick Harris, as bailee, received possession of the cattle but ownership only of a share of their calf crop. The question before us thus becomes whether this evidence in rebuttal is, as the district court concluded, so overwhelming as to compel summary judgment for appellees on the issue of ownership.

---

[7] N.D. Cent. Code § 36-09-19 provides that a "legally registered brand on livestock shall be prima facie evidence that the animal bearing the same is property of the owner of such brand."

The issue of ownership—whether the relocation and re-branding actually made Nick Harris owner rather than bailee of the animals—is essential to the Trust's claim. Confronted with a creditor's seizure of cows owned by someone other than the debtor, the Eighth Circuit stated as follows:

> We are aware of no cases in which the interest of a genuine bailee was sufficient to support the attachment of a security interest and [the creditor] has cited none. On the contrary, the cases have concluded that the security interest of a bailee's creditor does not attach to goods which are the subject of a bailment.

Rohweder v. Aberdeen Prod. Credit Ass'n, 765 F.2d 109, 112 (8th Cir. 1985) (citing In re Sitkin Smelting & Refining Inc., 639 F.2d 1213, 1216 (5th Cir. 1981); Chrysler Corp. v. Adamatic, Inc., 208 N.W.2d 97, 104-05 (Wis. 1973)). [8] Because appellant presents to us no Wyoming law contrary to the general rule, we agree with the Eighth Circuit's reasoning on this point, and address the question of whether Nick Harris received an ownership interest in the cattle or instead merely possessed them as the subject of a bailment.

---

[8] Several courts, including Rohweder and Cook, in attempting to assess similar ownership disputes as to branded cattle, have focused on the "rights in collateral" provision of UCC § 9-203(c). This case, however, does not implicate questions of interpretation of UCC § 9-203 because appellant does not—and cannot—assert an Article 9 security interest in the cattle, which obviously are the subject of the Trust's judgment lien rather than collateral for a loan by the Trust to Nick Harris. See Wyo. Stat. Ann. § 34.1-9-104(a)(viii) (providing that UCC Article 9 does not apply "[t]o a right represented by a judgment (other than a judgment taken on a right to payment which has [was] collateral)").

Quite apparently, the share agreement indicates the intent of the parties to effect a bailment. Appellant argues, however, that the relocation and re-branding of the cattle changed the nature of the transaction. We note that the Rohweder court faced a very similar situation, and considered the effect of re-branding on ownership, and whether such re-branding represents a transfer or a bailment. In that case, cattle owner Ray Rohweder entrusted his cows to Charles Bellman, pursuant to a share agreement—"not uncommon in the cattle business"—with an option to purchase. Rohweder, 765 F.2d at 110. Bellman branded some of Rohweder's cows with his own brand. See id. at 110-11. A creditor of Bellman's seized the cows, and Rohweder sued for conversion. See id. The Eighth Circuit found a genuine issue of material fact as to whether the share agreement transaction was "a true bailment, in which Bellman's interest is that of a bailee." Id. at 112. The creditor presented equitable estoppel arguments substantially analogous to those before us today. See id. at 112-13. Nevertheless, in addition to noting the absence of evidence of the creditor's reliance on Bellman's possession—a necessary element of estoppel under South Dakota law—the court noted that "[a] question also exists as to whether the presence of Rohweder's . . . brands on the cattle gave [the creditor] 'convenient access' to knowledge that Bellman did not own them." Id. at 113. Remanding the case for trial, the Eighth Circuit noted that once Rohweder demonstrates proof of ownership, the burden

- 14 -

shifts to the creditor to demonstrate that Bellman "possessed sufficient rights in the cattle for [the creditor's] security interest to attach." Id.[9] The critical question, the court realized,

> is the parties' intent . . . . [I]f the parties intended to create a bailment, with Rohweder retaining complete ownership of the cows and relinquishing only possession, Bellman would not have sufficient rights for attachment of [the creditor's] lien and, in the absence of an estoppel, Rohweder should prevail.

Id.

As the Eighth Circuit in Rohweder observed, the intent of the parties is the central focus in determining whether Nick Harris's possession and re-branding of the cows effected a change in ownership. Although, as the district court recognized, the record certainly contains evidence to suggest that Nick Harris may have implicitly asserted ownership of the cattle, this evidence is not necessarily sufficient to defeat a summary judgment motion. Rather, the inquiry must focus on the mutual intent of parties—whether their relation is that of bailor and bailee or otherwise. The share agreement provides powerful documentary evidence of the parties' explicit intent in relocating and re-branding the cattle, and that evidence displays an intent to give Nick Harris possession of the cattle and an interest in the calf crop, but not ownership of the cattle. Absent, therefore, other

---

[9] As discussed in the previous footnote, the question of UCC rights in collateral is not precisely applicable to the situation before us.

evidence that the younger Harrises intended to cloak Nick Harris with the power to use the cattle to satisfy a judgment against him, summary judgment on the issue of ownership was proper. Cf. State Bank of Young America v. Wagener, 479 N.W.2d 92, 94-95 (Minn. Ct. App. 1992) (affirming the grant of summary judgment for a livestock owner on the question of whether the owner's entrusting animals to a debtor pursuant to a share agreement effected a transfer or a bailment).

Despite the substantial factual analogies between this case and Rohweder, one important distinction should be noted. In Rohweder, the question was whether the creditor could make a showing that the bailee "possessed sufficient rights in the cattle for [the creditor's] security interest to attach." Id. at 113. For purposes of the UCC, "sufficient rights," are far less than full ownership rights. See Kinetics Tech. Int'l Corp. v. Fourth Nat'l Bank of Tulsa, 705 F.2d 396, 398-99 (10th Cir. 1983). The fact that the Rohweder court found a jury question as to rights in collateral in that case—which, it should be noted, involved an option to purchase on the part of the debtor, an element entirely lacking from the share agreement at issue in this case—does not necessarily mean there is a jury question as to actual ownership even under analogous circumstances.

Rohweder emphasizes that "factors of control over the cattle . . . are relevant evidence . . . in determining the parties' intent to transfer an ownership

interest." 765 F.2d at 113. Likewise, in Brown v. United States, 622 F. Supp. 1047, 1049 (D.S.D. 1985), the court looked to control over cattle to determine whether a transaction constituted a bailment or a transfer of ownership. Here, unlike in Brown, the share agreement did not give Nick Harris "almost unbridled discretion" over the disposition of the cattle. Id. Rather, Nick Harris's rights and duties were clearly to pasture and feed the cattle in exchange for a share of the calf crop pursuant to the share agreement. Therefore, we agree with the district court that the evidence in this case conclusively rebuts the presumption of ownership created by the presence of Nick Harris's brands on the cattle.

2.      The Effect of Multiple Brands

An additional factor compelling the conclusion that the re-branding in this case did not effect a change of ownership is that conflicting inferences arise from the multiple brands on the cows at issue. This is particularly so given the freshness of Nick Harris's brand. Older case law from western cattle-raising states, largely involving cattle rustling, suggests that the last brand is not automatically dispositive of ownership. See, e.g., Coomes v. Drinkwalter, 149 N.W.2d 60, 64 (Neb. 1967) (holding that, in cases of multiple brands, "it is prima facie evidence of ownership in the older brand"); State v. Moss, 188 P. 702, 706 (Or. 1920) (en banc) ("The first brand establishes ownership at one time and we think the presumption of continuance should apply until a change of ownership or

- 17 -

other evidence of ownership is shown."); <u>see also</u> 3A C.J.S. Animals § 19 (discussing general rule and citing cases). We emphasize that the Nebraska statute applicable in <u>Coomes</u>, like the Wyoming statute at issue here, provided generally that a brand functions as prima facie evidence of ownership. <u>See Coomes</u>, 149 N.W.2d at 64; <u>Bendfeldt</u>, 30 N.W.2d 293, 295. Faced with no citation by the parties to contrary authority, we infer that Wyoming's presumption-of-ownership statute, Wyo. Stat. Ann. § 11-20-108, creates a presumption similar to that of Nebraska and Oregon in the case of multiple brands of discernibly distinct vintage. The language of the Wyoming statute, providing for "prima facie evidence of ownership," without discussing the effect of multiple conflicting presumptions, would reasonably appear to indicate an intent to create a presumption analogous to that in effect generally in the branding laws of the various western states, with their purpose of protecting owners from theft. <u>See Coomes</u>, 149 N.W.2d at 63; 3A C.J.S. Animals § 19 & n.24. It seems an unreasonable reading of Wyo. Stat. Ann. § 11-20-108 to suggest that branding a cow <u>actually</u> transfers legal ownership, for the theft example refutes such a reading. We must ask, therefore, what happens when two prima facie presumptions, created by two different brands, clash head-on. The Wyoming statutory scheme, as well as Wyoming case law, is silent on this point as well.

One possible source of guidance might be the custom of the cattle industry,

- 18 -

but record evidence of this, as opposed to unsupported assertions in appellate briefs, is lacking. The affidavit of the brand inspector who inspected the cattle prior to seizure, while noting that Nick Harris's brand was "relatively fresh," makes no mention whatsoever of the older brands on the cattle. (Appellant's App. at 27.) Because of its unexplained silence on this point, we do not think the affidavit can be read as evidence one way or the other as to the relevance of an older brand under local custom. Given this absence of custom evidence, and what guidance we can derive from the older cattle rustling cases, we reject appellant's invitation to pronounce a rule that the presumption engendered by a newer brand trumps that engendered by an older brand under all circumstances.

While it is true that the older cases cited focus on the presumption of ownership in the holder of the older brand within the context of the theft of animals, we are presented with no authority, statutory or case law, to support the proposition that such a presumption does not apply without an allegation of theft. Moreover, the presumption is easily enough rebutted by evidence such as a bill of sale. Indeed, the reported cases demonstrate that situations arise outside the context of cattle rustling that require inquiry into conflicting presumptions arising from multiple brands. See, e.g., Rohweder, 765 F.2d at 112-13.

3. Other Evidence of Ownership

- 19 -

To support the prima facie evidence of ownership created by the presence of Nick Harris's brands and overcome Appellees' rebuttal evidence, the Trust relies on the following additional facts: that a lien search (under Nick Harris's name) revealed no liens; that a brand inspector determined ownership of the cattle in Nick Harris based on the fresh "J-N-J" brand, thus permitting seizure; that an FSA employee, Credit Manager Ericsson, testified that, by virtue of the "J-N-J" brand, Nick Harris owned the cows; and the execution in January 1998 of a document assigning a security interest in the cattle from Nick Harris to Brad and Delight Harris. We address each of these arguments.

A.    Lien Search

The fact that the Trust may have conducted a lien search and found no liens on the cattle is essentially irrelevant to the ultimate issue of ownership. While its satisfaction of its duty to inquire might be relevant to a good faith purchaser claim, it is simply irrelevant to the basic proposition that the Trust, as a judgment creditor, cannot claim the asset if it belongs to someone other than the person against whom its judgment obtains. See Rohweder , 765 F.2d at 112; Sorenson , 241 P. at 1071. The Trust offers no authority for the proposition that, if the cows are indeed the property of the younger Harrises and the interest of Nick Harris is merely that of a bailee, the Trust's interest as a judgment creditor can attach to the animals. See Rohweder , 765 F.2d at 112. Results of the Trust's lien search

are not directly pertinent to the dispositive question on the ownership issue—the intent of the various Harrises. Insofar as the lien search is relevant to the Trust's estoppel claim, we consider it in our analysis of that issue below.

### B. Brand Inspection

Because Appellee places reliance on the evidence of a brand inspection prior to seizure, we examine both the Wyoming law applicable to such inspections and the record facts pertaining to the nature of the particular inspection in this case.

Review of the Wyoming statute regarding brand inspectors reveals no particular provision for the procedure to be followed in the case of multiple brands. See Wyo. Stat. Ann. §§ 11-20-201 to 11-20-228. By contrast, Idaho law, at least at one time, specifically provided for discretionary inspection by a brand inspector with respect to "'all livestock bearing two or more brands.'" Oppenheimer Indus., Inc. v. Johnson Cattle Co., 732 P.2d 661, 662-63 (Idaho 1986) (quoting Idaho Admin. Proc. Act 11.02.3(a)). Furthermore, as of the time of Oppenheimer, in Idaho "fresh brands"—as the brands in this case were found by the inspector to be—required inspection or bill of sale covering the older brands as proof of ownership. Oppenheimer Indus., 732 P.2d at 663. [10] In the

---

[10] Although Idaho law currently requires that "[i]f the inspector finds that the livestock have brands that are not owned by the person claiming the same,

(continued...)

absence of any explicit Wyoming provision for the duties of inspectors as to animals bearing multiple brands, however, the brand inspector's affidavit is inconclusive as to the ultimate legal issue.

Furthermore, we need not concern ourselves with the effect of a certification following a brand inspection on the presumption of ownership, because the record in this case is wholly devoid of any evidence that any such certification was actually issued.    Wyo. Stat. Ann. § 11-20-203(a) provides that a certification or clearance is a prerequisite for livestock to be sold or removed from its county:

> Except as hereafter provided, it is unlawful for any person, firm, partnership, corporation, or association to sell and deliver, or to remove or cause to be removed in any way from any county in Wyoming to any other county, state or country, any livestock unless each animal has been inspected for brands and ownership at the time of delivery or removal by an authorized Wyoming brand inspector and a proper certificate of inspection or clearance has been issued.

While the record contains an August 1999 affidavit by brand inspector A.L. "Butch" Burdick stating that he inspected the Harris cows in January 1998, this affidavit is quite apparently not a "proper certificate of inspection" nor does

---

[10](...continued)
then such person shall be required to produce a bill of sale or other satisfactory evidence of ownership," Idaho Code § 25-1121(1) (1999), we are unable to locate the provision at issue in Oppenheimer in the current Idaho statutory codification. Any intervening change in Idaho law, however, is irrelevant to the subject of our analysis: the contrast between Idaho law at the time of the Oppenheimer decision and Wyoming law applicable to this case.

Burdick state that he executed such a certificate. Although the Trust states in its brief, without citation to the record, that the brand inspector inspected the brands pursuant to Wyo. Stat. Ann. § 11-20-205, which provides generally for inspection procedures, there is no actual assertion that a certificate of inspection was issued. The Trust states that "[a]fter inspection of the brands on each animal, seizure was authorized by the Brand Inspector," (Appellant's Br. at 7-8) but cites to no record support other than copies of Nick Harris's brand certificates, apparently issued in 1976, indicating that he owns the "J-N-J" and "W Diamond" brands.[11] Indeed, the record demonstrates that Burdick crossed out by hand from his typed affidavit a clause indicating he "was ready, willing and able to execute all documents necessary to allow the sale at the Riverton Livestock Auction." (Appellant's App. at 27.) This appears to indicate Burdick was unwilling to swear that he had executed or was prepared to execute an inspection certificate. Thus, in the absence of evidence of actual certification or clearance, we need not consider the effect of certification under Wyo. Stat. Ann. § 11-20-203(a) on the presumption of ownership established under Wyo. Stat. Ann. § 11-20-108 and rebutted by the additional evidence in this case.

---

[11] A brand certificate is different than a "proper certificate of inspection." Compare Wyo. Stat. Ann. §§ 11-20-104, 108 (providing for recording of brands and use of certified copies of recorded brands as prima facie evidence of ownership) with Wyo. Stat. Ann. § 11-20-203 (providing for brand inspection and issuance of certificate of inspection or clearance).

C. Ericsson Testimony

Appellants make much of deposition testimony given by FSA Credit Manager Ericsson. While we disagree with appellant's characterization of this testimony as an admission that Ericsson considered the re-branding to have effected a transfer of ownership—the testimony is far more ambiguous than that—we recognize that it is evidence that, viewed in the light most favorable to Appellant, supports an inference that Ericsson, at least, was concerned the re-branding could effect such a transfer. However, Ericsson's subjective concern does not go to the object of our inquiry in this case —the intent of the parties that the transaction constitute a bailment or instead a transfer of ownership. See Rohweder, 765 F.2d at 113. What Ericsson may or may not have believed about the legal consequences of the transaction is simply not dispositive of the intent of the parties entering into it.

D. January 1998 Security Agreement

In its reply brief, appellant cites a January 5, 1998, security agreement and financing statement as evidence of the younger Harrises' intent to transfer ownership. This document indeed references an assignment of a security interest in 200 "J-N-J" brand cows by "debtors" Nick and Sandra Harris to Brad and Delight Harris. ( Appellant's App. at 101.) While clearly indicative of the uncertainty created by the re-branding and an attempt to protect FSA's security

interest, this document is nevertheless insufficient to create a material dispute of fact as to intent when viewed in the context of otherwise overwhelming evidence of the lack of intent to transfer ownership. We consider below the effect of this document on the Trust's estoppel claim.

4.      Ownership: Conclusions

Having considered all the arguments and evidence, we conclude the district court did not err in granting summary judgment on the underlying issue of ownership. Unlike in Rohweder , the evidence does not permit multiple inferences as to the intent of the parties. See State Bank of Young Am. , 479 N.W.2d at 95 (affirming the grant of summary judgment for a hog owner against a creditor of debtors who fed the hogs pursuant to a share agreement because "the intent of the parties that [the owner] was to retain ownership and control of the hogs was clear"). Despite the running of the cattle on reservation land, Nick Harris's equivocal deposition testimony, and the January 5, 1998, security agreement, the documentary evidence is indeed overwhelming that the parties' intent under the share agreement was to create a bailment. See id. Whether or not certain parties acted in good faith towards the Tribe and the BIA—as opposed to towards the Trust—is simply not an issue appropriate for consideration in this proceeding. There is no material dispute of fact in this case which could establish intent on the part of the Harris children to give Nick Harris authority to encumber their

cattle. Because branding creates only prima facie evidence of ownership, which the additional evidence conclusively rebuts, and the terms of the share agreement explicitly do not provide for Nick Harris's authority to encumber the cattle, consent to branding is not sufficient to establish consent to Nick Harris's encumbrance of the property. Cf. Cook, 63 B.R. at 798. This leaves us, however, the question of whether there is a genuine issue of material fact regarding estoppel preventing either the Harris children or the government from asserting interests in the cattle.

**IV**

Appellant's estoppel arguments are governed by state law. See Rohweder, 765 F.2d at 112-13. Wyoming courts have defined the doctrine of equitable estoppel as follows: "[O]ne who by his acts or representations intentionally or through culpable negligence induces another to believe certain facts to exist, and the latter, not knowing the facts, acts on such belief to his substantial prejudice, the former is, in equity, estopped to deny the existence of such fact." Wyoming v. Peterson, 957 P.2d 1307, 1311 (Wyo. 1998) (quoting Seaman v. Big Horn Canal Ass'n, 213 P. 938 (Wyo. 1923)). [12] Wyoming courts "have defined culpable

_____

[12] Despite this general rule, Wyoming courts have warned that "[e]quitable estoppel should not be invoked against a government or public agency functioning in its governmental capacity, except in rare and unusual circumstances and may not be invoked where it would serve to defeat the effective operation of a policy

(continued...)

- 26 -

negligence as the intentional commission of an act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm will follow." Krier v. Safeway Stores 46, Inc. , 943 P.2d 405, 417 (Wyo. 1997) (citations and internal quotations omitted).

The Wyoming Supreme Court has announced its view of the application of the doctrine of estoppel as between an owner of property and a creditor of a third party who asserts a claim against the property based on an allegation that the owner allowed the third party to appear as the owner of the property:

> It is true, in the absence of fraud, an owner of property who permits another to appear as owner thereof is not estopped to assert ownership as against judgment creditors of the latter, since, where there is no fraud, a judgment creditor takes, as a rule, only the title of his judgment debtor, and cannot become an innocent purchaser of the property sold under judicial process. . . . But, to prevent fraud, the owner may be estopped to assert a title in an attachment suit by reason of his own acts or declarations concerning or relating to the ownership.

Sorenson , 241 P. at 1071 (citations omitted). With respect to the fraud exception of Sorenson , "[t]he elements of a claim for fraud are: 'a false representation made by the defendant which is relied upon by the plaintiff to his damage, the asserted

---

[12](...continued)
adopted to protect the public." Peterson , 957 P.2d at 1311 (quoting Big Piney Oil & Gas Co. v. Wyoming Oil & Gas Conservation Comm'n , 715 P.2d 557, 560 (Wyo. 1986) (further citation omitted)). Because we conclude appellant has failed to present a valid claim of estoppel against any of the appellees, we do not reach the question of whether there exist such exceptional circumstances as to permit operation of the doctrine against FSA.

- 27 -

false representation must be made to induce action, and the plaintiff must reasonably believe the representation to be true.'" Snyder v. Lovercheck, 992 P.2d 1079, 1084 n.1 (Wyo. 1999) (quoting Duffy v. Brown, 708 P.2d 433, 437 (Wyo. 1985)).

A

As to application of the doctrine of estoppel in the instant case, the record is devoid of affirmative evidence that the Harris children or the government "intended or expected that [their] inaction in notifying [the Trust] of [their] ownership in the cattle would be acted upon by the [Trust] or influence its decisions." Cook, 63 B.R. at 799. Our review of the record does not disclose evidence of defendants' knowledge of the Trust's claim against Nick Harris permitting an inference that the Harris children and FSA allowed the re-branding with the intent to induce the Trust to seize the cattle in satisfaction of the judgment. Even assuming that consent to Nick Harris's running the cattle on the reservation and branding them with his brands amounts to a false representation as to his ownership of the animals, the Trust points to no evidence such representation was "made to induce action" by the Trust, an essential element of fraud. Duffy, 708 P.2d at 437. Therefore, without evidence of intent to induce action, the fraud exception of Sorenson does not apply.

A question remains whether defendants' actions relocating the cattle and allowing Nick Harris to re-brand them supports an inference of culpable negligence. [13] We conclude that the Trust has raised sufficient issues of material fact so as to preclude summary judgment on this element of its estoppel claim. Even assuming, however, that defendants, by their actions in allowing re-branding, created through culpable negligence facts that could induce the Trust to believe the cattle belonged to Nick Harris, the Trust cannot prevail on an estoppel theory without showing facts demonstrating both reliance and lack of knowledge of the true facts or means to discover them. See Peterson, 957 P.2d at 1311; Roth v. First Sec. Bank of Rock Springs, 684 P.2d 93, 96 (Wyo. 1984) (stating that "two necessary components of equitable estoppel are (1) that the party lacked the knowledge of the facts and was without means to discover them; and (2) that he relied upon the actions of the parties sought to be charged and changed his position") (citation omitted); see also Rohweder, 765 F.2d at 113 ("[I]n general the party asserting an estoppel must have actually relied on some words or conduct of the one to be estopped, and must be without convenient

---

[13] We note that insofar as the Trust bases an estoppel claim on the January 5, 1998, security agreement, the Trust points to no evidence in the record that it had any knowledge of that document prior to its seizure of the cattle, thereby precluding any argument it relied to its detriment on that security agreement.

- 29 -

access to knowledge contrary to the facts on which he relied.") (citing In re Pubs, Inc. of Champaign, 618 F.2d 432, 438 (7th Cir. 1980)).

**B**

We inquire whether the Trust took any action in reliance on Nick Harris's possession and branding of the cattle. It is readily apparent that the Trust took action in seizing the cattle. Seizure alone, however, is not necessarily sufficient to establish the reliance element of estoppel. Reported opinions considering estoppel arguments by lenders have rejected such a proposition: "[I]n the absence of fraud, an attaching creditor takes only such title as the debtor had at the time, unless he has been misled by an apparent ownership of the property attached, and has given credit on the faith of such ownership." Sorenson, 241 P. at 1071 (citations omitted and emphasis added). The court in Rohweder, 765 F.2d at 113, likewise noted "[t]he estoppel argument may fail if it appears that [the party asserting estoppel] did not advance any additional credit to [the person possessing the cattle] after [that person] acquired possession of the . . . cattle." Thus, although extending credit is certainly not a particularly applicable form of reliance when considering a judgment creditor, the cases dealing with attaching creditors illustrate the necessity that a party asserting estoppel point to some reliance apart from simply seizing the property. The Trust does not tell us what such reliance might be in this case.

Appellees point out that the record lacks any affidavits or deposition testimony from representatives of the Trust attesting to their reliance on Appellees' actions. Appellant does not present any evidence of facts suggesting reliance other than seizure alone—facts such as, perhaps, foregoing the satisfaction of its judgment against some other assets of Nick Harris due to reliance on his apparent ownership of the livestock at issue in this case. Because Sorenson indicates that seizure alone is insufficient reliance to establish estoppel, and because the fraud exception of Sorenson does not apply in the present case, the necessary reliance element of estoppel fails.

## C

Additionally, the Trust's estoppel claim fails for lack of evidence that it "lacked the knowledge of the facts and was without means to discover them." Roth, 684 P.2d at 96. See also Snyder, 992 P.2d at 1084 n.1 (noting that to establish fraud a plaintiff "must reasonably believe the representation to be true" (citation omitted)). In Rohweder, the court noted that "[a] question also exists as to whether the presence of [older] brands on the cattle gave [the party asserting estoppel] 'convenient access' to knowledge that [the possessor] did not own them." Id. at 113. In that regard, however, at least one court has noted that "[a]ny prudent, prospective lender or purchaser is well aware that cattle may be custom fed or cows may be leased." Robbins v. Comerica Bank-Detroit (In re

Zwagerman) , 115 B.R. 540, 553 (Bankr. W.D. Mich. 1990). We see no reason why a judgment creditor should not be required to exercise similar prudence. As discussed below, the co-existence of older brands with relatively fresh brands appears to trigger at least some minimal duty to inquire into the ownership of the animals, which would have yielded "convenient access" to the interests of the younger Harrises and FSA. Rohweder , 765 F.2d at 115. Moreover, whether or not the Trust was under any legal duty to inquire, certainly inquiry provided the "means to discover" the true facts. Roth , 684 P.2d at 96.

We recognize that, upon first glance, the holding in MBank Waco, N.A. v. L. & J., Inc. , 754 S.W.2d 245, 251-52 (Tex. Ct. App. 1988) appears to be contrary to our holding. The status of the plaintiff in MBank Waco as a bona fide purchaser, however, was dispositive, and therefore that case is materially distinct from this one both on its facts and in its legal theory. In MBank Waco , the Texas Court of Appeals held that,

> [b]y voluntarily entrusting [a debtor] with possession and allowing him to place his brand on the cattle, the [the owners] clothed him with indicia of ownership of the cattle purchased with their money. Accordingly, their conduct estopped them as a matter of law from asserting legal title to the cattle or to the proceeds of their sale in the hands of MBank, a good-faith purchaser.

Id. (citing McKinney v. Croan , 188 S.W.2d 144, 146 (1945)) (emphasis added). McKinney , cited by the court in MBank Waco , refers to the protections to which a good-faith purchaser is entitled as against a true owner who vests apparent

- 32 -

ownership in a seller. See McKinney, 188 S.W.2d at 146. Therefore, both MBank and McKinney, like the Oklahoma case of Kissare, 98 P. at 434, deal with the particular protections due to good-faith purchasers and do not control the specific case of a judgment creditor who seizes from a debtor, without giving value, goods owned by a third party. Under Wyoming law, the Trust does not enjoy good-faith purchaser protection, but rather to prevail it must establish all the elements of estoppel enumerated in Sorenson, 241 P.2d at 1071.

Citing First Nat'l Bank, Cortez, Colorado v. First Interstate Bank, Riverton, Wyoming, 774 P.2d 645, 649 (Wyo. 1989), the district court held that "the observance of the older brands put the trust on inquiry notice and created a duty in the trust to determine the source of these cattle." (Appellant's App. at 137.) We agree. Although, as discussed, appellant relied on a title search as to Nick Harris, the record is silent as to whether it had actual notice of facts establishing the Harris children's ownership of the cattle; the negative results of a lien search cannot obviate actual knowledge. As noted by the Wyoming Supreme Court in First Nat'l Bank, "[i]f [appellant] had actual knowledge of the security agreement, then its duty to inquire is even more clear." Id. at 650.

Appellant vigorously disputes any duty to inquire into interests based on older brands, arguing that a duty to inquire into older brands would disrupt the expectations and ordinary operation of the cattle industry. Its argument is that a

duty to trace "each brand on each cow" to its origin "would cripple, in every practical sense, the commerce of the cattle industry." (Appellant's Br. at 25.) Appellant, however, fails to produce any law or evidence of custom to support that proposition. As noted, what law there is on this subject suggests, at least in the case of "relatively fresh" brands there may arise potentially conflicting presumptions as to ownership, and that under some circumstances the presumption arising from the older brand prevails. See Coomes, 149 N.W.2d at 64; Moss, 188 P. at 706. Moreover, we emphasize the extremely narrow nature of the issue presented by the facts before us: Whether, under the particular facts of this case, to permit subsequent assertion of an estoppel claim, a judgment creditor seeking to seize cattle need conduct minimal inquiry into the ownership interests in those cattle when faced with a multiple brands, one of which is freshly healed. We fail to see that this minimal duty, under the highly specific set of facts before us today and in the context of the doctrine of estoppel, will trigger widespread disruption in the cattle industry. As for the hypothetical situations the Trust raises in its briefs involving the sale and re-sale of cattle, those situations are simply not before us and are not implicated by our holding in this case, which is restricted to its peculiar factual circumstances. We leave the resolution of those situations—and any others distinct from the peculiar facts of this case—to the Wyoming courts.

On the record before us, we cannot conclude the district court erred in finding for estoppel purposes, based on the existence of relatively fresh brands alongside older brands, that those brands put a judgment creditor on inquiry notice of the potential existence of ownership interests in the cattle based on the older brands.   See In re Zwagerman , 115 B.R. at 553.  Had inquiry been made into the older brands, the Trust would readily have obtained notice of the FSA's security interest and discovered the Harris children's ownership interests in the cattle.  See Rohweder , 765 F.2d at 113-15.

We therefore conclude that the absence of evidence, either of fraud or else of prejudicial reliance and lack of convenient access to correct information, proves fatal to Appellant's estoppel claim.

## V

Finally, we turn to appellant's arguments that the relocation and re-branding of the cattle invalidated FSA's security interest therein.[14]  As an initial matter, we note that neither party has addressed the impact of the district court's ruling on the issues of ownership and estoppel on the necessity of addressing this issue.  Since we affirm the district court's conclusion that the Trust has no property interest in the cattle, we do not see how ruling in its favor on the security

---

[14]  We discern no challenge to the security interest of defendant Norwest Bank of Gillette, which apparently withdrew from these proceedings, and therefore have no occasion to rule on any issues associated with that interest.

interest issue could offer it any meaningful relief. Appellee FSA argues for the correctness of the district court's ruling that FSA's security interest was unaffected by the re-branding and relocation of the cattle, (see FSA Br. at 13,) while it appears from the briefs that the Harris appellees take no position on this particular issue. Because we fail to see how consideration of the validity of FSA's purchase money security interest can produce any relief for the Trust, and no other party has cross-appealed the district court's ruling on this point, we do not consider further the validity of the security interest.

## VI

For the reasons set forth above, we conclude the district court did not err in granting summary judgment for Defendants-Appellees. Our review of the record and applicable law confirms that the record evidence permits but one conclusion with regard to the ownership of the cattle and the inapplicability of the doctrine of estoppel. We note the district court's expression of concern for the length of time Appellant's judgment has gone unsatisfied and recognize that the re-branding could certainly be viewed as creating a presumption of Nick Harris's ownership. However, because the record convincingly rebuts that presumption, and because application of the equitable doctrine of estoppel would be improper under the circumstances, we cannot remedy Appellant's grievance by arbitrarily altering the ownership of the animals at issue.

The judgment of the district court is **AFFIRMED** .